Christopher **KORTLANDER**,
et al., Plaintiffs,

v.

**UNITED STATES**, Defendant.

No. 11–601C.

United States Court of Federal Claims.

Aug. 16, 2012.

Andrew T. Miltenberg, Nesenoff & Miltenberg, LLP, New York, NY, for the plaintiffs.

Ryan M. Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Steven J. Gillingham, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, and Stuart F. Delery, Acting Assistant Attorney General, Civil Division. Of counsel, Karan L. Dunnigan, Field Solicitor's Office, United States Department of the Interior, Billings, MT.

## OPINION

HORN, Judge.

Plaintiffs, Christopher Kortlander, Historical Rarities, Inc., the Custer Battlefield Museum, Inc., and the Elizabeth Custer Library and Museum, Inc., bring claims for compensatory damages arising from alleged misconduct by federal officials employed by the United States Department of the Interior, Bureau of Land Management and the United States Fish and Wildlife Service.[1] Plaintiffs' complaint is rambling, disjointed and, in many respects, it is difficult to sort relevant information from colorful background details. Plaintiffs appear to allege violations of multiple Amendments to the United States Constitution, various tortious and potentially criminal conduct by government officials, without citing to any specific federal statute or Amendment, save for quoting from the Fifth Amendment and mentioning the Sixth Amendment right to a speedy trial, although they concede that a trial never occurred. Plaintiffs claim jurisdiction based on "the existence of a federal question pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claim [sic] Act ... and the deprivation of civil rights pursuant to 28 U.S.C. [§ ] 1343(a)(3)."[2]

## FINDINGS OF FACT

According to the complaint, Mr. Kortlander owns Garryowen, Montana, a private town located within the perimeter of the Custer Battlefield at the site of Sitting Bull Camp. Mr. Kortlander purchased Garryowen in the early 1990s, built the Custer Battlefield Museum, Inc. and headed a for-profit corporation, Historical Rarities, Inc., through which Mr. Kortlander "bought and sold Custer collectibles." It appears, however, that Mr. Kortlander had plans to develop Garryowen to include a second museum, which was to house the largest extant collection of

1. Plaintiffs also listed "the Federal Bureau of Investigation, the United States Attorney and other unknown federal agents and agencies," as defendants on the face of their complaint, but crossed them out prior to filing the complaint. Pursuant to Rule 10(a) of the Rules of the United States Court of Federal Claims (RCFC) (2012), all claims in the United States Court of Federal Claims, must have "the United States designated as the party defendant...." RCFC 10(a); *see also* 28 U.S.C. § 1498(a)(1) (2006). The United States Supreme Court has indicated, for suits filed in the United States Court of Federal Claims and its predecessors, "[i]f the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court." *United States v. Sherwood,* 312 U.S. 584, 588, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (citations omitted). Stated differently, "the only proper defendant for any matter before this court is the United States, not its officers, nor any other individual." *Stephenson v. United States,* 58 Fed.Cl. 186, 190 (2003) (emphasis in original); *see also United States v. Sherwood,* 312 U.S. at 588, 61 S.Ct. 767; *May v. United States,* 80 Fed.Cl. 442, 444 ("Jurisdiction, then, is limited to suits against the United States."), *aff'd,* 293 Fed.Appx. 775 (Fed.Cir.2008).

2. Previously, plaintiffs Christopher Kortlander, Historical Rarities, Inc., and the Custer Battlefield Museum, Inc., filed suit in United States District Court for the District of Montana, alleging violations of the First, Second, Third, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by agents of the United States Department of the Interior, Bureau of Land Management. *See Kortlander et al. v. Cornell,* 816 F.Supp.2d 982 (D.Mont.2011). The agents filed a motion to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (2006). The District Court granted defendants motion on September 12, 2011, concluding "that every cause of action must be dismissed because it is barred by the statute of limitations or is implausible." The court noted that "many of the claims, such as those for violation of the Second, Third, Fifth, Sixth, Eighth and Fourteenth Amendments, can only be described as frivolous and treading dangerously close to violating Rule 11(b) [of the Federal Rules of Civil Procedure]." *Id.* at 999; *see also id.* at 1000–1001. Seven days later, the plaintiffs filed suit in the United States Court of Federal Claims.

Custer manuscripts. Garryowen also included a Subway sandwich shop, a Trading Post, a United States Post Office, a Conoco gas station, and a convenience store.

Plaintiffs allege in their complaint that an investigation of Mr. Kortlander "began in 2003, with complaints from an unnamed source," and was "reopened" in the same year at the urging of another unnamed former Bureau of Land Management employee, "who felt that the use of the Lingard Letter [a copy of which was filed with plaintiffs' complaint] was inappropriate by Kortlander." The complaint states that the Lingard Letter was written in 1994 by Bureau of Land Management, undercover agent Lee Lingard, the ex-husband of a woman Mr. Kortlander later dated.[3] According to the plaintiffs' complaint, the Lingard Letter, written on official Bureau of Land Management letterhead, provided the "government's opinion" that certain artifacts obtained by Jason Pitsch from his father's land, which borders Mr. Kortlander's Garryowen property and is located inside the exterior perimeter of the Custer Battlefield, "were legally obtained, ostensibly because the items in this collection were found on private, not federal land." Plaintiffs claim that the Lingard Letter "would later serve as evidence of legitimacy for many—including Pitsch, Kortlander and others—in the sale of artifacts acquired from private fee land around the battle site owned by Pitsch and others." According to plaintiffs, Mr. Lingard used Mr. Pitsch to interact with Mr. Kortlander and to spy on Mr. Kortlander's relationship with Mr. Lingard's ex-wife.

The complaint states:

From 1995 to 1998, Pitsch functioned as something of a "double agent" and provided information to his BLM [Bureau of Land Management] handlers, while slipping information to Kortlander, among others. During these years, whenever Pitsch was coming to Garryowen with then undercover BLM agent Lee Lingard (his BLM handler), Pitsch would advise Kort-

lander of Lingard's intent to visit Garryowen to look for any activity dealing in contraband artifacts. There was never any such activity at Garryowen, but Pitsch was interested in parlaying his "informant" status into whatever ego-boost or potential prestige that would serve to enhance his perceived personal value and credibility.

Plaintiffs also indicate that Mr. Pitsch's bank required the Lingard Letter in order to accept artifacts found on the Pitsch property as collateral for a federally funded Small Business Administration loan for Mr. Pitsch to build a fort-style building next to Garryowen. According to plaintiffs' complaint, the Bureau of Land Management claimed it had sent Mr. Kortlander a letter instructing him to cease use of the Lingard Letter because Mr. Lingard "had no legal standing to make such an authentication claim for the pieces in question, because he had not seen them physically removed from nonfederal lands." According to the complaint, in 2005, "the letter [sic] Lingard letter would be a key element of the BLM's case against Kortlander when the BLM went before a federal magistrate to obtain a Search Warrant...."

Plaintiffs allege that in 2005, the Bureau of Land Management sought a search warrant against Mr. Kortlander, and the application for the search warrant stated that "he buys, sells, and appraises artifacts." Plaintiffs also allege "this is a completely legal activity, but was used to imply that something was happening that was improper or even illegal." According to plaintiffs, the Bureau of Land Management had previously engineered an operation to "entrap" Mr. Kortlander, which was used to justify the search warrant. Regarding plaintiffs' explanation of this alleged "entrapment," plaintiffs state that a Bureau of Land Management undercover agent attempted to sell items to Mr. Kortlander under the ruse of being stranded and out of gas, and, thus, needing money. Plaintiffs allege that Mr. Kortlander purchased three buttons and a suspender buckle from the

---

**3.** According to the plaintiffs, in 1995, Mr. Kortlander had reported Mr. Lingard to the Office of the Inspector General for his alleged actions "because of threats reported by [his ex-wife] Cathy Lingard regarding Lee Lingard's conduct and behavior which compromised Cathy Lingard's and Kortlander's safety." According to the complaint, the Office of the Inspector General investigated Mr. Lingard.

agent. Plaintiffs do not identify the origin or type of buttons and suspender buckle Mr. Kortlander purchased. Plaintiffs also state that federal agents made repeated phone calls to Historical Rarities, Inc., seeking "uniform civil war/Indian war" buttons. One of the agents identified himself as the father of a United States soldier serving in Iraq. According to the complaint, Mr. Kortlander "did not pay any attention to the multiple solicitations, but finally acquiesced," to the father, suggesting that Mr. Kortlander sold the father a button. Plaintiffs also claim that a second button was purchased by the Bureau of Land Management personnel, which was delivered to an undercover buyer. Plaintiffs state, however, that "the button was not the button that had been offered for sale as being from the battlefield."

Plaintiffs' complaint also states:

More than a month later while working undercover, agent Brian Cornell contacted Kortlander by phone complaining about paperwork. He asserted that Kortlander then agreed to sell another, additional button. However, no button was sold, no money was tendered and that transaction for an additional button was never completed. No other paperwork was ever provided by Kortlander and no other sale occurred, despite the assertion of Cornell that an additional transaction had taken place.

Reviewing the button count, between 2004 and 2005, two buttons were sold and delivered, no false signed certifications were delivered, and no crime was committed, except for false statements made by the BLM and the BLM's illegal entrapment procedures.

The BLM obtained a search warrant asserting that Kortlander was "any person to knowingly defraud, or devise a scheme to defraud, using wire in interstate commerce or through the mail." The problem with the search warrant is that no crime had been committed, as had been alleged by the federal agents. The only truth is that the BLM and its agents, including Special Agent-in-charge Bart Fitzgerald and Special Agent Brian Cornell, created a scheme to entrapment [sic] of Kortlander.

Plaintiffs' complaint further indicates that on March 31, 2005, pursuant to the search warrant, armed federal agents, conducted a raid and apparently searched the premises of the Trading Post, the Custer Battlefield Museum, Mr. Kortlander's private residence located on the upper floor of the museum, the basement vault of the museum, additional, unattached buildings and Mr. Kortlander's truck. Plaintiffs insist that the search warrant authorized entry only into the Trading Post and museum, and that the federal agents obtained entry into the other areas through intimidation and threats. Plaintiffs assert that the federal agents seized hundreds of items and artifacts that belonged to plaintiffs Kortlander, Historical Rarities, Inc., and the Custer Battlefield Museum, Inc. Plaintiffs state that the items were not illegal to possess, nor evidence of a crime, although one of the special agents, Brian Cornell, accused Mr. Kortlander of "getting rich off this 'scheme,' and said something about Kortlander lining his pockets with cash. Cornell continued his diatribe about Kortlander's supposed knowledge of an intention to attribute false documentation with historical artifacts for personal profit and gain."

According to the complaint, as a result of the 2005 raid, "a fundraising and lobbying company in Washington, D.C.," with whom Mr. Kortlander had been working to secure funds for a new museum in Garryowen, withdrew from the project, costing $15,000.00 in a non-refundable retainer. Additionally, plaintiffs allege that federal agents impugned Mr. Kortlander's reputation and ruined his business over the next few years by contacting people who had done business with him, telling them that Mr. Kortlander had engaged in criminal activities. Plaintiffs also state that the Little Horn State Bank called a large line of credit on Mr. Kortlander "following the publicity of the raid" and the issuance of "a subpoena for records from Little Horn State Bank." Consequently, Mr. Kortlander, "had to impose on personal friendships, placing a half-million dollar second mortgage on the Town of Garryowen that still must be repaid and continues to accrue interest." Additionally, according to plaintiffs, "[a]ll of Kortlander's complex business activities were scruti-

nized in an exhaustive federal audit" and "there was NO UNLAWFUL PRACTICE discovered in a complete federal criminal audit." (emphasis in original).

According to plaintiffs, the United States Fish and Wildlife Service released several documents to Mr. Kortlander in response to Freedom of Information Act requests. According to the complaint, in one document, an agent allegedly had written that "the investigation has not revealed any 'clear cut' instances of Kortlander buying or selling eagle feathers...." In short, plaintiffs assert that "[t]he evidence is that Cornell and BLM did know that there was no foundation for the assertions that Kortlander was offering any of the feathers or feathered items for sale to anyone."

Although plaintiffs state in parts of their complaint that Mr. Kortlander was prosecuted, in other parts of the complaint plaintiffs state that Mr. Kortlander was never indicted. Plaintiffs allege that:

> The cost of defending these Plaintiffs [4] throughout the prosecution including the much threatened federal indictment, alleging nine serious felonies (totaling a possible 130 years in federal prison), plus many misdemeanors, was significant. The attendant publicity destroyed Kortlander's businesses, also costing him his operating lines of credit. It also caused him to incur thousands of dollars in attorney's fees. Kortlander was advised to secure significant amounts of money for a defense fund, in anticipation of a federal indictment. Looking for additional financing, Kortlander determined to sell the Township of Garryowen, including much of HIS personal property. In 2006, he contacted a nationally known auction company—Heritage Auctions (located in Dallas, Texas)—for that purpose. A representative of Heritage Auctions traveled to Garryowen.... Federal agents contacted Heritage Auctions, interfering with Kortlander's con-

tractual relationship. The agents used their federal cloak of intimidation, innuendo and outright lies to discredit Kortlander, and thus effectively blocking the proposed sale.[5]

Plaintiffs further contend:

> In 2006 and 2007, Brubaker, Hellson, and Wolfleg were all in the sights of U.S. federal officials for stealing literally thousands of maps and documents, and then selling them on EBay. Asked if they had ever done business with Kortlander, all three were willing to implicate Kortlander, albeit without a shred of confirming evidence, as a buyer and seller of eagle and migratory bird feathers. Lighter sentences or no charges at all were the result.... By 2008, Brubaker was singing like a canary to save his own hide on the second conviction.

In 2008, Mr. Kortlander "filed a federal lawsuit against Heritage Auctions for breach of contract, fraudulent business practices (RICO), and conversion. BLM Agent Brian Cornell traveled to Dallas, Texas, in June, 2008 to continue his pursuit of Kortlander." According to plaintiffs, three men, James Brubaker, John Hellson, and Alan Wolfleg, "formed the basis of initial allegations that the Custer Battlefield Museum and its feathered items were for sale, submitted by Special Agent Cornell in his affidavit to obtain a search warrant in September 2008." Plaintiffs claim that "Brubaker, Hellson, and Wolfleg are an interesting gang of thieves and ne'er-do-wells." Plaintiffs state "In 2008, the BLM conducted a second raid, executing a Search Warrant, at Garryowen, this time seizing items on display at the Custer Battlefield Museum on the premises. Several items were seized in that raid."[6] Plaintiffs also allege that, "[t]he Application for the Search Warrant states that it was based upon information obtained as a result of the execution of the Search Warrant, March 31, 2005. Information from the first (March 31,

---

**4.** From the complaint it appears "these Plaintiffs" refers to Mr. Kortlander and the Custer Battlefield Museum, Inc.

**5.** Moreover, plaintiffs assert that the threat of prosecution aggravated Mr. Kortlander's Ehlers–Danlos Syndrome, with which he was diagnosed

during the "federal investigation following the raid."

**6.** When referencing the raid by the Bureau of Land Management, plaintiffs mostly do not identify whether they are referring to the 2005 raid or the 2008 raid.

2005) Search Warrant was used to obtain the November 2008 Search Warrant, thus being the product of the 'poisonous tree.' "

Near the end of the complaint, plaintiffs summarize their claims of wrongdoing by the Bureau of Land Management and its agents under a series of underlined headings: "No Probable Cause for the 2008 Search Warrant," "Loss of Business," "Conclusions," "Equal Protection," "Illegal Search and Seizure," "Right to Speedy Trial," and "Damages." These headings are indistinguishable from prior headings in the complaint which separate the factual events described in the complaint, except that the second set of headings tends to use legal phrases such as "probable cause" and "equal protection." There is no place in the complaint in which the plaintiffs' legal claims cognizable in this court are specifically identified. For example, under the heading, "No Probable Cause for the 2008 Search Warrant," plaintiffs argue:

> The investigation and raids of Garryowen represent more than a mere conspiracy to damage Kortlander. The actions of BLM Special Agent Brian Cornell, supervised by BLM Special Agent in Charge Bart Fitzgerald, and the other agents and agency officials amounted to an abuse of resources for personal and political purposes.... There never was any evidence of any crime, as had been alleged to provide probable cause to obtain the September, 2008, Search Warrant. Absent probable cause, the Search Warrant fails. However, the United States wrongfully continues to retain possession of the items seized in the execution of that Search Warrant, denying Plaintiffs the lawful use of said items to their economic loss and damage.

Under the heading, "Loss of Business," plaintiffs assert that as a result of the federal government's actions, "[p]laintiffs' business ceased and dried up," which caused plaintiffs to reduce monthly shipments from the local United States Post Office that rented space in Garryowen, and which subsequently closed, eliminating some of plaintiffs' revenue. Under the heading, "Conclusions," which, curiously, is located not at the end of the complaint, but rather in between other headings, plaintiffs claim that, "[f]or more than four-and-a-half (4 1/2) years the BLM and the federal government investigated, harangued, slandered, threatened, and intimidated Kortlander with the full weight of the federal government." [7] According to plaintiffs, "the lies and misrepresentations of [Special Agent] Cornell and others unlawfully and wrongfully denied Kortlander his most fundamental Constitutional rights." Plaintiffs further allege that Mr. Kortlander was not permitted to confront the witnesses against him. Plaintiffs also state:

> The evidence gathered for the various search warrants was entirely the product of (a) entrapment by an ambitious "sting" operation, (b) based upon the testimony and reports of known felons and stalkers with obvious prejudice towards Kortlander, and/or (c) contrived by an overzealous agent, Cornell.... The actions of [Special Agents] Cornell, Fitzgerald, and unknown others toward Kortlander have severely and maliciously attacked the very fundamental Constitutional rights of Kortlander, and thus every American.

Under the heading, "Equal Protection," plaintiffs quote from the Fifth Amendment to the United States Constitution that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." Plaintiffs then state:

> Here, the United States will claim that the Plaintiffs were never charged and that there never were any legal proceedings. However, this seems inconsistent with the obtaining of search warrants from federal judges, as well as the filing of applications for search warrants in federal court.... The actions denied Plaintiffs due process,

---

**7.** Plaintiffs' complaint, filed in this court in 2011, does not explain why the plaintiffs allege that the intimidation had been occurring for only 4 1/2 years. The facts asserted in the complaint describe alleged wrongdoing by the Bureau of Land Management employees dating back several more years, including the 2005 raid, which, according to the plaintiffs, also included agents obtaining entry to portions of property not allowed by the 2005 search warrant through implied threats and intimidation.

thus denying them equal protection under the Constitution.

Under the heading, "Illegal Search and Seizure," plaintiffs allege that "[t]he Search Warrants, were unsupported by probable cause, based upon the representations and misrepresentations of agent(s) of the United States. The misleading and untruthful statements were made even though the truth was known by the agents, but willfully ignored. The actions of the federal agents amounted to an unlawful search and seizure, resulting in an unlawful taking of the property by the United States." Under the heading, "Right to Speedy Trial," plaintiffs assert that the federal government "sidestep[ed]" the Sixth Amendment because it never charged plaintiffs, which "amounts to a 'thumbing of the nose' attitude to the Constitution, while using unbridled power of the federal government to obtain non judicial justice. This is wrong!" As a result of the federal government's alleged misconduct, plaintiffs seek $188,500,000.00 in damages.[8]

## DISCUSSION

In lieu of an answer, defendant moved to dismiss plaintiffs' complaint for lack of subject matter jurisdiction. Alternatively, defendant asserted that plaintiffs' claims must be dismissed for failure to state a claim upon which relief may be granted "because a majority of plaintiff's [sic] claims are barred by the applicable six-year statute of limitations pursuant in 28 U.S.C. § 2501, and that all of the claims fail to meet the heightened pleading standards under *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868

(2009), and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)." When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that the undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))); *Cambridge v. United States,* 558 F.3d 1331, 1335 (2009) (citing *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

■ " '[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.' " *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (quoting *United States v. Cotton,* 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki,* —— U.S. ——, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011); *see also Hertz Corp. v. Friend,* 559 U.S. 77, 130 S.Ct. 1181, 1193, 175 L.Ed.2d 1029 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdic-

---

**8.** The cover sheet filed with the court and attached to the compliant lists the amount claimed as: "$79,950,000.00 + $25,600,000.00." In the complaint, plaintiffs, however, claimed total damages in the amount of $188,500,000.00. Aside from the inconsistency between the complaint and the cover sheet, which appears not to account for plaintiffs Custer Battlefield Museum, Inc. and the Elizabeth Custer Library and Museum, Inc., plaintiffs made errors in their damages computations. For example, Mr. Kortlander's claim is for property damages of $58,950,000.00 plus personal injury damages of $21,500,000.00, which the complaint indicates equals $79,950,000.00. The sum of $58,950,000.00 plus $21,500,000.00, however, is $80,450,000.00. Similarly, the claim by plaintiff Historical Rarities, Inc. is for property damages of

$15,600,000.00 plus personal injury damages of $10,500,000.00, which plaintiffs state equals $25,600,000.00. The sum of $15,600,000.00 plus of $10,500,000.00, however, is $26,100,000.00. Furthermore, plaintiffs erroneously place a period, rather than a comma, in their calculated "Total," listing damages for Mr. Kortlander as $58,950,000.00 in property damage and $21,500,000.00 in personal injury damages, but provide a total damages claim for Mr. Kortlander of $79,950,000, rather than $79,950,000.00. Additionally, the plaintiffs' calculations of the various elements of Mr. Kortlander's damages are incorrect. Plaintiffs identify twelve categories for Mr. Kortlander's "property" and "personal injury" damages. Adding all the "property" category damages, the result is $52,950,000.00, not $58,950,000.00, as plaintiffs claim.

tion exists, even when no party challenges it." (citing *Arbaugh v. Y & H Corp.*, 546 U.S. at 514, 126 S.Ct. 1235)); *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed.Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing *Johannsen v. Pay Less Drug Stores N.W., Inc.*, 918 F.2d 160, 161 (Fed.Cir. 1990))); *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. at 506, 126 S.Ct. 1235; *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed.Cir.2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing *Arbaugh v. Y & H Corp.*, 546 U.S. at 506, 126 S.Ct. 1235; *Folden v. United States*, 379 F.3d 1344, 1354 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2004), *cert. denied*, 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); and *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998))); *Pikulin v. United States*, 97 Fed.Cl. 71, 76, *appeal dismissed*, 425 Fed.Appx. 902 (Fed. Cir.2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where, as here, neither party has raised this issue." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1369 (Fed.Cir.) (citing *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1485 (Fed.Cir.), *reh'g and en banc suggestion denied* (Fed.Cir.), *cert. denied*, 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 58 (1998)), *reh'g and reh'g en banc denied* (Fed.Cir. 2004), *cert. dismissed* as *improvidently granted*, 548 U.S. 124, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006).

Pursuant to the RCFC 8(a) and Rule 8(a) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) (2012), a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2), Fed. R.Civ.P. 8(a)(1), (2); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. at 1949–50 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555–57, 570, 127 S.Ct. 1955). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)), *reh'g denied* (Fed.Cir. 1997); *see also Klamath Tribe Claims Comm. v. United States*, 97 Fed.Cl. 203, 208 (2011); *Gonzalez–McCaulley Inv. Grp., Inc. v. United States*, 93 Fed.Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed.Cir.1998); *see also McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1363 n. 9 (Fed.Cir.2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, *Federal Practice and Procedure* § 1286 (3d ed. 2004)). As stated in *Ashcroft v. Iqbal*, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' [*Bell Atlantic Corp. v. Twombly*,] 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. at 1949 (quoting Bell *Atlantic Corp. v. Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "Where subject matter jurisdiction over a claim is at issue, the plaintiff must establish the Court's jurisdiction by a preponderance of the evidence." *United Keetoowah Band of Cherokee Indians in Oklahoma v. United States*, 104 Fed.Cl. 180, 182–83 (2012) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir.1988)).

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Erickson v. Pardus*, 551 U.S. at 94,

127 S.Ct. 2197 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 555–56, 127 S.Ct. 1955 (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. at 508 n. 1, 122 S.Ct. 992)); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United Pac. Ins. Co. v. United States,* 464 F.3d 1325, 1327–28 (Fed.Cir.2006); *Samish Indian Nation v. United States,* 419 F.3d 1355, 1364 (Fed.Cir.2005); *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2002), *cert. denied,* 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003).

■ The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2006). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Navajo Nation,* 556 U.S. 287, 290, 129 S.Ct. 1547, 173 L.Ed.2d 429 (2009); *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *see also Greenlee Cnty., Ariz. v. United States,* 487 F.3d 871, 875 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied,* 552 U.S. 1142, 128 S.Ct. 1082, 169 L.Ed.2d 810 (2008); *Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir.1999).

■ "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States...." *United States v. Mitch-*ell, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *see also United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *Samish Indian Nation v. United States,* 657 F.3d 1330, 1335 (Fed.Cir.2011); *reh'g and reh'g en banc denied* (Fed.Cir.), *petition for cert. filed,* 80 U.S.L.W. 3684 (U.S. Jun. 1, 2012); *Radioshack Corp. v. United States,* 566 F.3d 1358, 1360 (Fed.Cir.2009); *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d at 1343 ("[P]laintiff must ... identify a substantive source of law that creates the right to recovery of money damages against the United States."). In *Ontario Power Generation, Inc. v. United States,* 369 F.3d 1298 (Fed.Cir.2004), the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

> The underlying monetary claims are of three types.... First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver.... Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." *Eastport S.S. [Corp. v. United States,* 178 Ct.Cl. 599,] 372 F.2d [1002,] 1007–08 [ (1967) ] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting *Clapp v. United States,* 127 Ct.Cl. 505, 117 F.Supp. 576, 580 (1954)))... Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." *Eastport S.S. [Corp. v. United States* ], 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Id.; see also [United States v.] Testan,* 424 U.S. [392,] 401–02, 96 S.Ct. 948 ("Where the United States is the defendant and the

plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting *Eastport S.S.* [*Corp. v. United States* ], 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

*Ontario Power Generation, Inc. v. United States,* 369 F.3d at 1301.

■ To prove that a statute or regulation is money mandating, plaintiffs must demonstrate that an independent source of substantive law relied upon " 'can fairly be interpreted as mandating compensation by the Federal Government.' " *United States v. Navajo Nation,* 556 U.S. at 290, 129 S.Ct. 1547 (quoting *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948); *see also United States v. White Mountain Apache Tribe,* 537 U.S. at 472, 123 S.Ct. 1126; *United States v. Mitchell,* 463 U.S. at 217, 103 S.Ct. 2961; *Blueport Co., LLC v. United States,* 533 F.3d 1374, 1383 (Fed.Cir.2008), *cert. denied,* 555 U.S. 1153, 129 S.Ct. 1038, 173 L.Ed.2d 468 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. *See United States v. Navajo Nation,* 129 S.Ct. at 1551 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[ ] that operate[s] to waive sovereign immunity for claims premised on other sources of law (*e.g.,* statutes or contracts).").  " 'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.' " *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.,* 525 F.3d 1299, 1308 (Fed.Cir.2008) (quoting *Greenlee Cnty., Ariz. v. United States,* 487 F.3d at 876); *Fisher v. United States,* 402 F.3d 1167, 1173 (Fed.Cir.2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); *Peoples v. United States,* 87 Fed.Cl. 553, 565–66 (2009).

■ Plaintiffs assert:

Jurisdiction in this Court is founded on the existence of a federal question pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claim [sic] Act (hereinafter "FTCA"), including its various amendments and the regulations related thereto, and the deprivation of civil rights pursuant to 28 U.S.C. [§ ] 1343(a)(3).

Federal question jurisdiction arises under 28 U.S.C. § 1331 (2006), not under 28 U.S.C. § 1346(b) (2006), which is part of the Federal Tort Claims Act (FTCA). As stated by the United States Court of Appeals for the Federal Circuit, the Court of Federal Claims "correctly held that it lacks the general federal question jurisdiction of the district courts . . . ." *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997); *Hall v. United States,* 69 Fed.Cl. 51, 56–57 (2005) ("The United States Court of Federal Claims, however, is not a United States District Court and, therefore, does not have jurisdiction over claims arising under 28 U.S.C. § 1331. *See Faulkner v. United States,* 43 Fed.Cl. 54, 55 (1999) ("The Court of Federal Claims does not have federal question jurisdiction under 28 U.S.C. § 1331.") (citing *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997)). Section 1331 is a jurisdictional statute that "do[es] not create any substantive right enforceable against the United States for money damages." *See DeVilbiss v. Small Business Adm.,* 661 F.2d 716, 718 (8th Cir. 1981)."); *see also Mims v. Arrow Fin. Servs., LLC,* —— U.S. ——, 132 S.Ct. 740, 747, 181 L.Ed.2d 881 (2012) ("Congress granted federal courts general federal-question jurisdiction in 1875. *See* Act of Mar. 3, 1875, § 1, 18 Stat. 470. As now codified, the law provides: 'The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.' 28 U.S.C. § 1331.") (footnote omitted); *Fry v. United States,* 72 Fed.Cl. 500, 504–505 (2006) ("Sections 1331 and 1340 of Title 28 of the United States Code only confer jurisdiction on United States District Courts. Similarly, section 6330 and section 7429 only confer jurisdiction on United States District Courts and the United States Tax Court. The United States Court of Federal Claims is not a 'district court,' within the

meaning of either 28 U.S.C. §§ 1331, 1340 or 26 U.S.C. §§ 6330, 7429.") (citing 28 U.S.C. §§ 1331, 1340 and 26 U.S.C. §§ 6330, 7429) (footnotes and additional citation omitted).

The statute at 28 U.S.C. § 1346(b)[9] defines the jurisdiction of the United States District Courts, not the jurisdiction of the United States Court of Federal Claims. *See Bowling v. United States,* 93 Fed.Cl. 551, 557 (citing 28 U.S.C. § 1346(b)(1)) ("The FTCA is subject to 28 U.S.C. § 1346(b)(1), which gives United States district courts exclusive jurisdiction over tort claims against the government.... The CFC [United States Court of Federal Claims] has no subject matter jurisdiction over tort claims and therefore is unable to offer relief to Mr. Bowling under the FTCA."), *recons. denied* (2010); *see also Hairston v. United States,* 99 Fed.Cl. 695, 697 (2011) (citing 28 U.S.C. § 1491(a)(1)) ("the Tucker Act specifically states that the Court of Federal Claims lacks jurisdiction over claims sounding in tort. This Court [the United States Court of Federal Claims] thus lacks jurisdiction over [plaintiff's] FTCA [Federal Tort Claims Act] and *Bivens* actions, both of which seek redress for constitutional torts.") (citing *Brown v. United States,* 105 F.3d 621, 624 (Fed.Cir.1997) and *Pendleton v. United States,* 47 Fed.Cl. 480, 485–86 (2000) (stating that the Court of Federal Claims lacks jurisdiction to entertain a tort claim under the FTCA)).

■ In fact, to the extent the plaintiffs describe conduct sounding in tort, such as slander, defamation, interference with contract, harassment, intimidation, misrepresentation, conspiracy, false imprisonment, intentional infliction of emotional distress, and assault, among others, the Tucker Act expressly excludes tort claims, including those committed by federal officials, from the jurisdiction of the United States Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1); *see also Keene Corp. v. United States,* 508 U.S. 200, 214, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993); *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d at 1343; *Alves v. United States,* 133 F.3d 1454, 1459 (Fed.Cir.1998); *Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.), *reh'g denied* (Fed.Cir. 1997); *Golden Pac. Bancorp v. United States,* 15 F.3d 1066, 1070 n. 8 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *Hampel v. United States,* 97 Fed.Cl. 235, 238, *aff'd,* 429 Fed. Appx. 995 (Fed.Cir.2011), *cert. dismissed,* —— U.S. ——, 132 S.Ct. 1105, 181 L.Ed.2d 973 (2012); *Woodson v. United States,* 89 Fed.Cl. 640, 650 (2009); *McCullough v. United States,* 76 Fed.Cl. 1, 3 (2006), *appeal dismissed,* 236 Fed.Appx. 615 (Fed. Cir.), *reh'g denied* (Fed.Cir.), *cert. denied,* 552 U.S. 1050, 128 S.Ct. 675, 169 L.Ed.2d 529 (2007); *Agee v. United States,* 72 Fed.Cl. 284, 290 (2006); *Zhengxing v. United States,* 71 Fed.Cl. 732, 739, *aff'd,* 204 Fed.Appx. 885 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2006).

■ Similarly, to the extent that plaintiffs are alleging criminal conduct on the part of federal employees, this court lacks jurisdiction to adjudicate those claims. *See Joshua v. United States,* 17 F.3d 378, 379 (Fed. Cir.1994); *see also Mendes v. United States,* 88 Fed.Cl. 759, 762, *appeal dismissed,* 375 Fed.Appx. 4 (Fed.Cir.2009); *Hufford v. United States,* 87 Fed.Cl. 696, 702 (2009) (holding that the Court of Federal Claims lacked jurisdiction over claims arising from the violation of a criminal statute); *Matthews v. United States,* 72 Fed.Cl. 274, 282 (finding

---

9. The statute at 28 U.S.C. § 1346(b) states:

(b)(1) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

(2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

that the court lacked jurisdiction to consider plaintiff's criminal claims), *recons. denied*, 73 Fed.Cl. 524 (2006); *McCullough v. United States*, 76 Fed.Cl. at 4 (finding that the court lacked jurisdiction to consider plaintiff's criminal claims). Therefore, plaintiff's claims of misconduct by federal officials, whether criminal or tortious, may not be heard in this court.

▆▆▆ Plaintiffs also assert that the federal agents' actions denied them "due process, thus denying them equal protection under the Constitution." The United States Court of Appeals for the Federal Circuit has held that this court does not possess jurisdiction to consider claims arising under the Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. *See Crocker v. United States*, 125 F.3d at 1476 (citing *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed.Cir.1995)) (no jurisdiction over a due process violation under the Fifth and Fourteenth Amendments); *see also In re United States*, 463 F.3d 1328, 1335 n. 5 (Fed.Cir.) ("[B]ecause the Due Process Clause is not money-mandating, it may not provide the basis for jurisdiction under the Tucker Act."), *reh'g and reh'g en banc denied* (2006), *cert. denied sub nom. Scholl v. United States*, 552 U.S. 940, 128 S.Ct. 50, 169 L.Ed.2d 243 (2007); *Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States*, 458 F.3d 1327, 1334 (Fed.Cir.2006); *Collins v. United States*, 67 F.3d 284, 288 (Fed.Cir.) ("[T]he due process clause does not obligate the government to pay money damages."), *reh'g denied* (Fed.Cir. 1995); *Mullenberg v. United States*, 857 F.2d 770, 773 (Fed.Cir. 1988) (finding that the Due Process clauses "do not trigger Tucker Act jurisdiction in the courts."); *Murray v. United States*, 817 F.2d 1580, 1583 (Fed.Cir.1987) (noting that the Fifth Amendment's Due Process clause does not include language mandating the payment of money damages); *Hampel v. United States*, 97 Fed.Cl. at 238; *McCullough v. United States*, 76 Fed.Cl. at 4 ("[N]either the Fifth Amendment Due Process Clause ... nor the Privileges and Immunities Clause provides a basis for jurisdiction in this court

because the Fifth Amendment is not a source that mandates the payment of money to plaintiff."). Therefore, to the extent that plaintiff raises allegations of violations of due process, no cause of action can be brought in this court. Due process claims "must be heard in District Court." *Kam–Almaz v. United States*, 96 Fed.Cl. 84, 89 (2011) (citing *Acadia Tech., Inc. v. United States*, 458 F.3d at 1334), *aff'd*, 682 F.3d 1364 (Fed.Cir.2012); *see also Hampel v. United States*, 97 Fed.Cl. at 238.

▆▆▆ Likewise, the Equal Protection Clause of the Fourteenth Amendment does not mandate the payment of money by the federal government and, therefore, the United States Court of Federal Claims does not have jurisdiction over the plaintiff's Fourteenth Amendment equal protection claims. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed.Cir.1995) ("His complaint included counts alleging violation of his rights under the ... Equal Protection Clause of the Fourteenth Amendment," an insufficient basis for jurisdiction because it does not mandate payment of money by the government (citing *Carruth v. United States*, 224 Ct.Cl. 422, 627 F.2d 1068, 1081 (1980))); *see also Schweitzer v. United States*, 82 Fed.Cl. 592, 598 n. 7 (2008) ("To the extent that the plaintiffs allege violations of the equal protection clause of the Fourteenth Amendment ... the equal protection clause does not mandate payment of money by the federal government for its violation, and therefore this court lacks jurisdiction over such claims." (citing *LeBlanc v. United States*, 50 F.3d at 1028)).

▆▆▆ In addition to due process and equal protection violation claims, plaintiffs make a general assertion that the federal government violated their civil rights.[10] The United States Court of Federal Claims, however, lacks jurisdiction to hear claims alleging deprivation of civil rights under color of law. *See Elkins v. United States*, 229 Ct.Cl. 607, 608 (1981) ("[W]e do not have jurisdiction over claims based upon alleged violations of the civil rights laws.") (citation omitted). Exclusive jurisdiction to hear civil rights claims resides in the federal district courts.

---

10. Plaintiffs do not identify how their civil rights were violated, but assert, "[j]urisdiction in this

Court is founded on ... the deprivation of civil rights pursuant to 28 U.S.C. [§ ] 1343(a)(3)."

*See* 28 U.S.C. § 1343 (2006); *see also Wagstaff v. United States,* 105 Fed.Cl. 99, 109–10 (2012); *May v. United States,* 104 Fed.Cl. 278, 284 (2012); *Willis v. United States,* 96 Fed.Cl. 467, 470 (2011); *McCullough v. United States,* 76 Fed.Cl. at 5; *Hanes v. United States,* 44 Fed.Cl. 441, 449 (1999), *aff'd,* 243 F.3d 562 (Fed.Cir.), *reh'g denied* (2000); *Blassingame v. United States,* 33 Fed.Cl. 504, 505, *aff'd,* 73 F.3d 379 (Fed.Cir.1995), *reh'g denied, cert. denied,* 517 U.S. 1237, 116 S.Ct. 1885, 135 L.Ed.2d 179 (1996).

The statute at 28 U.S.C. § 1343(a)(3) (2006)[11] specifically provides for jurisdiction in the United States District Courts. The United States Court of Federal Claims is not mentioned in the statute, and, thus, this court does not have jurisdiction pursuant to 28 U.S.C. § 1343(a)(3). Plaintiffs, therefore, have not cited to a statute which provides jurisdiction in this court. Insofar as plaintiffs' claims regarding "Illegal Search and Seizure" and violations of a "Right to Speedy Trial," concern the Fourth and Sixth Amendments to the United States Constitution, these Amendments also are not money-mandating and, therefore, jurisdiction to review these claims does not lie in this court. *See Kam–Almaz v. United States,* 96 Fed.Cl. at 89 ("[T]his Court does not have jurisdiction to hear claims contesting the lawfulness of a search and seizure because due process and Fourth Amendment claims are reserved to the District Court." (citing *LeBlanc v. United States,* 50 F.3d 1025 (Fed.Cir.1995))); *Treece v. United States,* 96 Fed.Cl. 226, 231 (2010) (citing *Milas v. United States,* 42 Fed.Cl. 704, 710 (1999) (finding that the Sixth Amendment is not money-mandating), *aff'd,* 217 F.3d 854 (Fed.Cir.1999)); *Hernandez v. United States,* 93 Fed.Cl. 193, 198 (2010) ("Plaintiff avers that his rights under the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Fourteenth, and Fifteenth Amendments were violated. None of these claims allege a violation for which money damages

are mandated."); *Fry v. United States,* 72 Fed.Cl. at 507 ("As a matter of law, the Fourth Amendment's prohibition on unreasonable search and seizure and the Due Process Clause of the Fifth Amendment are not money-mandating." (citation omitted)); *Gable v. United States,* 106 Fed.Cl. 294, 298 (2012) (citing *Dupre v. United States,* 229 Ct.Cl. 706, 706 (1981) (finding that the court lacks jurisdiction over Sixth Amendment claims because the Sixth Amendment is not money-mandating)). Therefore, with the exception of the Takings Clause of the Fifth Amendment to the United States Constitution, the other Constitutional Amendments do not require the United States to pay money damages for a substantiated violation.

Plaintiffs appear to be trying to raise a Constitutional takings claim, stating in the complaint, "[t]he actions of the federal agents amounted to an unlawful search and seizure, resulting in an *unlawful* taking of the property by the United States." (emphasis added). Plaintiffs, however, have failed to satisfy essential elements of a proper takings claim, thereby also rendering this court without jurisdiction over plaintiffs' claims. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V The purpose of this Fifth Amendment provision is to prevent the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *see also Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978); *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074,

---

**11.** The statute at 28 U.S.C. § 1343(a) states:
(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
\* \* \*
(3) To redress the deprivation, under color of any State law, statute, ordinance, regula-

tion, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States[.]

161 L.Ed.2d 876 (2005); *E. Enters. v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Rose Acre Farms, Inc. v. United States,* 559 F.3d 1260, 1266 (Fed. Cir.), *reh'g en banc denied* (Fed.Cir. 2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1501, 176 L.Ed.2d 109 (2010); *Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Resource Invs., Inc. v. United States,* 85 Fed. Cl. 447, 469–70 (2009); *Pumpelly v. Green Bay & Miss. Canal Co.,* 80 U.S. (13 Wall.) 166, 179, 20 L.Ed. 557 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified.").

▐ A plaintiff must show that the government took a private property interest for public use without just compensation. *See Adams v. United States,* 391 F.3d 1212, 1218 (Fed.Cir.2004), *cert. denied,* 546 U.S. 811, 126 S.Ct. 330, 163 L.Ed.2d 43 (2005); *Arbelaez v. United States,* 94 Fed.Cl. 753, 762 (2010); *Gahagan v. United States,* 72 Fed.Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1377–78 (Fed.Cir.), *cert. denied,* 555 U.S. 1045, 129 S.Ct. 626, 172 L.Ed.2d 608 (2008) (citations omitted). The Federal Circuit has established a two-part test to determine whether governmental actions amount to taking of private property under the Fifth Amendment. *See Klamath Irr. Dist. v. United States,* 635 F.3d 505, 511 (Fed.Cir. 2011); *Am. Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1372 (Fed.Cir.) (citing *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995)), *reh'g en banc denied,* (2004). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. Then, the court must determine whether the government action is a " 'compensable taking of that property interest.' " *Huntleigh USA Corp. v. United States,* 525 F.3d at 1377 (quoting *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d at 1372).

▐ A plaintiff alleging a taking must have a legally cognizable property interest, such as the right of possession, use or disposal of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing *United States v. Gen. Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *CRV Enters., Inc. v. United States,* 626 F.3d 1241, 1249 (Fed.Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 2459, 179 L.Ed.2d 1211 (2011); *Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374–75 (Fed. Cir.), *reh'g denied* and en banc *suggestion denied* (Fed.Cir. 2000), *cert. denied,* 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001). "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372 (quoting *Wyatt v. United States,* 271 F.3d 1090, 1096 (Fed.Cir.2001), *cert. denied* 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002) and citing *Cavin v. United States,* 956 F.2d 1131, 1134 (Fed.Cir.1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372 (citing *Maritrans Inc. v. United States,* 342 F.3d 1344, 1352 (Fed.Cir.2003) and *M & J Coal,* 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." *Air Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1213 (Fed.Cir.) (citing *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1381 and *Conti v. United States,* 291 F.3d 1334, 1340 (Fed.Cir. 2002), *cert. denied,* 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003)), *reh'g denied and reh'g en banc denied* (Fed.Cir. 2005). Only if there is to be a next step, "after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." *Huntleigh USA Corp. v. United States,* 525 F.3d at 1378 (quoting *Am. Pelagic Fishing Co. v. United States,* 379 F.3d at 1372).

▐ To pursue a takings claim in the United States Court of Federal Claims, the plaintiff, however, must " 'concede the validi-

ty of the government action which is the basis of the takings claim to bring suit under the Tucker Act.'" *Hearts Bluff Game Ranch, Inc. v. United States,* 669 F.3d 1326, 1332 (Fed.Cir.) (quoting *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir.1993)), *cert. denied,* —— U.S. ——, 132 S.Ct. 2780, 183 L.Ed.2d 640 (2012). In their complaint, plaintiffs did not concede the validity of the government action underlying the alleged taking, and appears throughout the lengthy narrative to argue the contrary, repeatedly mentioning the "raids," and using terms like "seizure," "illegal," and "unlawful." Nor have plaintiffs demonstrated a valid property interest in the items allegedly seized by the government, or demonstrated that the items were taken for a public use.

The entirety of the complaint is based on the premise of the government's alleged wrongful raid on the property. The complaint states several times that the items "seized" by the government were not contraband nor evidence of any crime, although plaintiffs indicate that some of the items seized were used as part of an investigation. As noted by the defendant, "only one paragraph in plaintiff's [sic] 67 page complaint [in the Conclusions section], under the subheading 'Illegal Search and Seizure,' even hints at the notion that plaintiff's [sic] complaint alleges a takings claim." The statement plaintiffs make in the complaint concerning a taking is that an "unlawful taking" occurred as the result of an "unlawful search and seizure" conducted during the 2005 and 2008 raids, indicating plaintiffs' belief that the taking was invalid. Only in their response to defendant's motion to dismiss does plaintiffs' new counsel throw in the suggestion that the "initial seizure was valid." Moreover, plaintiffs' new attorney in his response to defendant's motion to dismiss, argues that the taking occurred in 2009, although the raids referred to in the complaint occurred in 2005 and 2008 and the investigation against plaintiffs appears to have been closed by 2009.

Plaintiffs cite to a notorious case, *King v. United States,* 364 F.2d 235 (5th Cir.1966), for the proposition that when the government retains private property, seized as evidence in a criminal investigation, subsequent to determining that the property was not associated with any crime, a taking occurs. In *King,* the United States Court of Appeals for the Fifth Circuit found that Lee Harvey Oswald had not violated the Federal Firearms Act 15 U.S.C. §§ 901–910 (1964) (repealed 1968), and that, therefore, the confiscation of the rifle and pistol used in the assassination of President Kennedy could not be retained by forfeiture, but, rather found that if the government wished to retain them, they had to be condemned and compensation was owed. *King v. United States,* 364 F.2d at 235, 241. The defendant points out that, "*King* is neither binding authority nor is it relevant, as that case addressed the narrow issue of whether property is subject to forfeiture under the terms of a specific Federal forfeiture statute, 15 U.S.C. § 905(b), when that property serves as an instrumentality of a crime in violation of the provisions of another statute, the Federal Firearms Act." Moreover, both the forfeiture statute and the Federal Firearms Act discussed in *King* since have been repealed. Furthermore, plaintiffs state in their complaint that: "In 2009, the BLM returned many of the items seized in the raid of 2005, and one of the items seized in the 2008 raid, stating that it (the BLM) was going to retain all items it deemed to contain contraband...." The court notes that, "[a] person ... acquires no property interest in contraband." *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 240 (1983), *aff'd,* 765 F.2d 159 (Fed.Cir.), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).

In *AmeriSource Corp. v. United States,* 525 F.3d 1149 (Fed.Cir.) *reh'g and reh'g en banc denied* (Fed.Cir. 2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1611, 173 L.Ed.2d 993 (2009), the United States Court of Appeals for the Federal Circuit considered whether the Takings Clause applied "when the government seize an innocent third party's property for use in a criminal prosecution but never introduce the property in evidence, and it [wa]s rendered worthless over the course of the proceedings." *Id.* at 1150. The Federal Circuit in *AmeriSource* affirmed the decision of the United States Court of Federal Claims that the takings clause did not apply because the items were seized pursuant to

the police power. *Id.* at 1157. The Federal Circuit stated: "Although the precise contours of the principle are difficult to discern, it is clear that the police power encompasses the government's ability to seize and retain property to be used as evidence in a criminal prosecution," which is not considered a taking for public use. *Id.* at 1153 (citation omitted). The Federal Circuit further explained, "the inquiry remains focused on the character of the government action, not the culpability or innocence of the property holder." *Id.* at 1154 (citing *Bennis v. Michigan,* 516 U.S. 442, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) in which the United States Supreme Court found the seizure of property in which an innocent third-party had an interest was not subject to compensation pursuant to the police power, suggesting that "the innocence of the property owner does not factor into the determination.").

In *Acadia Technology Inc. & Global Win Technology, Ltd. v. United States,* 458 F.3d at 1332–33, the United States Court of Appeals for the Federal Circuit found that items seized as part of a civil investigation were seized pursuant to the federal government's police powers and were not, therefore, subjects of a taking, even though the plaintiff argued there was an unreasonable delay in the government returning the property. In *Acadia,* United States Customs and Border Protection seized a shipment of plaintiff's fans and returned them four years later, after the United States Department of Justice's civil forfeiture action was dismissed. *Id.* at 1329. The Federal Circuit wrote:

> the courts have recognized a right not to have property held in such settings for an unreasonable time and have crafted a remedy to vindicate that right. Following the seizure of property, the owner of the property has a due process right to have the government either return the property or initiate forfeiture proceedings without unreasonable delay. In the case of such delay, the Supreme Court has held that a property owner has a remedy in a United States district court that has been recognized since the early nineteenth century.... A violation of due process rights, however, does not give rise to a claim for

money damages against the United States in the Court of Federal Claims.

*Id.* at 1333–34. Thus, plaintiffs could have initiated an action in a United States District Court if they believed that the government unreasonably delayed the return of their property, but cannot seek relief in the United States Court of Federal Claims for a taking.

■ In response to defendant's motion to dismiss, plaintiffs also assert that: "The 'public use' language does not require that the property actually be put to use for the general public." (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1014, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). Plaintiffs have failed to recognize the distinction between property taken for purpose of a civil or criminal investigation pursuant to the federal government's police powers and property taken pursuant to the federal government's power of eminent domain. The latter may be a taking, the former is not. *See AmeriSource v. United States,* 525 F.3d at 1153–55; *Acadia Tech. Inc. & Global Win Tech., Ltd. v. United States,* 458 F.3d at 1331–33; *Arbelaez v. United States,* 94 Fed.Cl. 753, 762 (2010); *Husband v. United States,* 90 Fed.Cl. 29, 36 (2009).

Even if plaintiffs were to have conceded the validity of the government's seizure of plaintiff's property in their complaint, plaintiffs have not stated a takings claim because the items were seized as part of the government's police powers. *See Arbelaez v. United States,* 94 Fed.Cl. at 757; *Husband v. United States,* 90 Fed.Cl. at 36 (" 'There is a difference between government action that constitutes an exercise of police power and action that constitutes a compensable taking. If the Government acts to secure a benefit for the public, a taking arises. Government action taken to prevent harm to the public is [a non-compensable] exercise of the police power.' ") (quoting *Alde, S.A. v. United States,* 28 Fed.Cl. 26, 34 (1993)).

■ Furthermore, as argued by defendant: "Plaintiff [sic] does not cite, and the complaint does not contain, any paragraphs alleging that just compensation was unlawfully withheld—a prerequisite for a validly pled takings claim." Instead, defendant notes that plaintiffs' replacement lawyer argues for the first time in his response to the motion to

dismiss, that it was the government's failure to compensate plaintiffs that was unlawful. As this court has noted: " '[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.' " *Mendez–Cardenas v. United States,* 88 Fed.Cl. 162, 166–67 (2009) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)); *see also Hufford v. United States,* 87 Fed.Cl. 696, 701 (2009) (quoting *McGrath v. United States,* 85 Fed.Cl. 769, 772 (2009) (" 'This court does not possess jurisdiction to hear claims presented for the first time in responsive briefing.' ")). To the extent the plaintiffs raised the issue of the government's failure to compensate the plaintiffs for the first time in response to the defendant's motion to dismiss, it may not cure a defect in the complaint. In sum, plaintiffs' takings claim is not properly before this court.

### CONCLUSION

For the reasons discussed above, defendant's motion to dismiss plaintiffs' complaint is **GRANTED.** Because plaintiffs do not allege any claims within the jurisdiction of this court, the court does not reach the defendant's statute of limitations arguments. Plaintiffs' complaint is **DISMISSED.** The Clerk's Office shall enter **JUDGMENT** consistent with this opinion.

IT IS SO ORDERED.