PER CURIAM.
 

 Timothy A and Peggy J. Janowsky appeal the United States Court of Federal Claims’ summary judgment,
 
 [1]
 

 Janowsky v. United States,
 
 36 Fed. Cl. 148 (1996), dismissing their contract and Fifth Amendment taking claims. We vacate the judgment and remand the case.
 

 Background
 

 In September or October of 1984, Federal Bureau of Investigation agents informed Timothy Janowsky that he “was number 8 on [an unspecified] hit list” and advised him “to be careful and keep [his] head down.”
 
 [2]
 
 Shortly thereafter, they asked Janowsky to help them investigate bribery, extortion, and corruption by and among local police officials, organized crime members, vending company owners, and others. The agents requested, moreover, to transform Janowsky’s business, Geno’s Vending, into an FBI operated facade. Under FBI direction, Janowsky would abandon legitimate accounts, purchase gambling equipment, bribe corrupt officials, record incriminating conversations, and perform other tasks.
 

 Janowsky agreed to assist them and began following FBI orders but, from the outset, feared that the investigation would bankrupt his business. He therefore sought to limit potential financial loss. After negotiating with FBI agents, who verbally promised to indemnify him, Janowsky directed his attorney to draft a proposed agreement. Paragraph twelve of the March 1985, proposal read:
 

 It is agreed between the parties that [at] the conclusion of this investigation it will be necessary for Tim Janowsky to discontinue his vending machine business and that said business will have to be sold or otherwise disposed of. The value of said business has been independently assessed to be in the sum of $643,200.00. It is agreed that Tim Janowsky will attempt to sell his vending business to a private party[.] It is further agreed that regardless
 
 *890
 
 of the amount of that sale price Janowsky will be entitled to receive ... monetary rewards.... However, if the total amount of rewards received ... and the sale price of the vending/games business, are less than $300,000, then in that event the F.B.I. agrees to pay Tim Janowsky the sum of money equal to the difference of $300,000 and the total amount received from ... rewards ... and the amount received as the sale price of the business.
 

 Paragraph seventeen further stipulated that the “document constitute^] the full and complete agreement between Janowsky and the F.B.I.” Janowsky signed the proposed agreement, which John C. MeGinley, Special Agent in Charge of the Gary, Indiana Division of the FBI, enclosed in a letter to the United States Attorney for the Northern District of Indiana. In the letter dated March 26, 1985, MeGinley noted that the contract “was prepared with FBI i[n]put.” He additionally wrote that the FBI Headquarters had “final FBI authority with regard[ ] to any and all personal services contracts entered into by the FBI ... and ... may desire to further modify [the] proposed agreement.”
 

 It is unclear whether Janowsky’s proposed agreement itself ever reached the FBI Headquarters for approval. In a letter dated December 12, 1985, McGinley’s successor, William C. Ervin, wrote, “Mr. Janowsky’s ... proposed agreement ... was unacceptable to the FBI.” Ervin did not clarify whether his office or the FBI Headquarters deemed the proposal unacceptable. He merely indicated that his office submitted a different proposed agreement to the FBI Headquarters in a July 1, 1985, letter. According to Ervin, the different proposed agreement, with the FBI Headquarters’ August 1985 modifications, “eonstitute[d] a finalized proposal for Mr. Janowsky’s consideration.” Paragraph fifteen of the counteroffer would have absolved the FBI of any “responsibility or liability for any business loss or income loss which may result to [Janowsky] and/or [his] business as a result of contractual agreements entered into by [him] in furtherance of the investigation and with the full knowledge of the FBI.” Neither Timothy Janow-sky, whom Ervin described as “adamant that he wanted certain items included in the proposed Personal Services Agreement for FBIHQ consideration,” nor Peggy Ja-nowsky signed it or any other agreement.
 

 Shortly before Ervin submitted the “finalized proposal” to Janowsky, the FBI indirectly exposed him as an informant. According to Janowsky’s May 29, 1991, declaration in response to the trial court’s April 19, 1991, inquiry:
 

 In July or August, 1985, FBI agents revealed part of the evidence against one of the upper echelon targets of the investigation to induce that target to cooperate with the government ...; part of the evidence revealed was evidence I had secured and revelation of that evidence revealed my role as a cooperating witness to that particular target.
 

 Janowsky further recounted that agents conditioned his family’s safety upon his cooperation. Janowsky declared:
 

 FBI agents [E. Michael] Kahoe and [Phillip] Hultgen advised me that I had no choice but to continue cooperating with the FBI; specifically, I was advised that at least one person had been killed and that the death was related to the investigation. I was also advised that my only protection was that afforded by the FBI. I was advised that if I stopped participating in the investigation, the FBI would not be able to protect me or my family.
 

 Janowsky continued to cooperate, his family members survived, and the investigation ended. Effectively controlling Geno’s vending from December 1984 until early 1988, the FBI ultimately arrested several suspects, recovered $47,000 in back taxes, and seized $650,000 in forfeitures. The Janowskys sued. The case has an extensive procedural background, which is set out at 36 Fed. Cl. at 150-51.
 

 Discussion
 

 We review the Court of Federal Claims’ grant of summary judgment
 
 de novo,
 
 drawing all reasonable inferences in favor of the Janowskys.
 
 See Winstar Corp. v. United States,
 
 64 F.3d 1531, 1539 (Fed.Cir.1995) (in
 

 
 *891
 
 banc),
 
 aff'd,
 
 518 U.S. 839, 116 S.Ct. 2432 (1996). The Janowskys claim that the United States breached an implied-in-fact contract. “[Ajnyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.”
 
 Federal Crop Ins. Corp. v. Merrill,
 
 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Moreover, to prevail in a breach of contract action against the government, a party normally must prove that it contracted with an agent authorized to bind the United States.
 
 See Housing Corp. of Am. v. United States,
 
 199 Ct.Cl. 705, 468 F.2d 922, 925 (1972) (noting plaintiffs’ “responsibility” to show that agents acted within their authority). However, citing
 
 Silverman v. United States,
 
 230 Ct.Cl. 701, 679 F.2d 865 (1981), the Janowskys argue that the government may ratify its agents’ unauthorized, prior promises.
 

 In
 
 Silverman,
 
 a court-reporting service, which was a subcontractor on a government contract, shipped Federal Trade Commission (FTC) hearing transcripts to the contractor e.o.d. to ensure payment. The contractor refused the shipment. A senior FTC official, who lacked contracting authority but bore authority to approve vouchers for goods and services, told the subcontractor that the FTC would pay it directly for the transcripts. Based on this representation, the subcontractor redirected the transcripts to the FTC.
 
 Id.
 
 679 F.2d at 868. The court held that there was an implied-in-fact contract, which the FTC ratified.
 
 Id.
 
 679 F.2d at 871. The court said:
 

 Although the senior FTC official was not a contracting officer for the FTC, with expressly delegated authority to make contracts for the Government, the FTC retained and utilized the transcripts which the plaintiff released to the FTC on the basis of the official’s promise. By accepting the benefits flowing from the senior FTC official’s promise of payment, the FTC ratified such promise and was bound by it.
 

 Id.
 
 679 F.2d at 870.
 

 Viewed most favorably to the Janowskys’ contract claim, this case is strikingly similar. FBI agents promised compensation for the Janowskys’ business, and the Janowskys’ attorney drafted a proposed agreement with FBI input, which was submitted for approval. Thereafter the FBI allowed the undercover operation to continue. Only after capturing one or more targets did the FBI inform the Janowskys that they would not receive the compensation specified in the proposed agreement. The Janowskys claim' that the FBI ratified the proposed contract by (1) allowing the sting operation to proceed and (2) retaining the resulting benefits.
 

 The government argues that there was no contract because the FBI agents who promised compensation for the Janowskys’ business lacked authority to bind the government contractually. And the government argues that the Janowskys’ reliance on
 
 Silverman
 
 is misplaced because this court held in
 
 City of El Centro v. United States,
 
 922 F.2d 816 (Fed.Cir.1990), that there must be a promise “by an official empowered to bind the government to pay for the [services] rendered” for an implied-in-fact contract to exist.
 

 In
 
 City of El Centro,
 
 a hospital treated illegal aliens for injuries they sustained while fleeing border patrol agents. Suing to recover the treatment costs, the hospital contended that (1) a border patrol agent implied before the hospital treated the patients that the government would pay the costs, and (2) the United States Border Patrol’s acceptance of the hospital’s care ratified an implied-in-fact contract between the hospital and the border patrol agent. In rejecting the institutional ratification argument, this court distinguished
 
 Silverman
 
 because the FTC official there, although without contracting authority, did have authority to approve vouchers for goods and services. The court also determined that the United States Border Patrol received no benefit from the hospital’s care for the patients, whereas in
 
 Silverman
 
 the government received a direct benefit from the receipt of the FTC transcript hearings. Discussing
 
 Philadelphia Suburban Corp. v. United States,
 
 217 Ct.Cl. 705 (Ct.C1.1978), the court also acknowledged that institutional ratification may occur when the government accepts benefits.
 

 The
 
 Philadelphia Suburban
 
 case was one where again the Government received a
 
 *892
 
 direct benefit — the Government took and used plaintiffs firefighting foam to put out a fire on two ships that had collided.... In the case before us, [the hospital] had the opportunity to make its proof that the Government, given the totality of the circumstances, contracted, if not formally at least in fact, for the goods and services involved, and that these goods and services were for the benefit of the Government. In this, [the hospital] failed.
 

 922 F.2d at 823.
 
 El Centro,
 
 therefore, denied the hospital’s contract claim because it failed to show that the government received a direct benefit from the implied-in-fact contract. The Court of Federal Claims erred when it dismissed the Janowskys’ implied-in-fact contract claim without considering whether the agency ratified the proposed contract with the Janowskys by allowing the sting operation to continue and by receiving the benefits from it. A genuine issue of material fact thus exists concerning the contract claim.
 

 Alternatively, the Janowskys allege that the FBI “took” their property. Under the Fifth Amendment of the United States Constitution, “private property [shall not] be taken for public use, without just compensation.” A principal purpose of the Takings Clause is “to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.”
 
 Armstrong v. United States,
 
 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). According to the Court of Federal Claims, the Janowskys acted voluntarily: they “allowed the FBI to use their business in a sting operation because they believed they would be compensated financially.”
 
 Janowsky,
 
 36 Fed. Cl. at 158. “[A]s a matter of law,” the court held, “there can be no taking in the voluntary circumstances of this case.”
 
 Id.
 
 The United States likewise contends that “[t]he voluntariness of their participation belies the Janowskys’[ ] allegations that the value of their business was diminished and that they lost the ability to run the business as a viable for-profit entity.”
 

 Nevertheless, viewed most favorably to the Janowskys Fifth Amendment claim, the facts bespeak coercion. Whether or not
 

 Janowsky joined the investigation voluntarily, he retained the right to resume control of Geno’s Vending at any time. When the FBI rejected his proposed agreement, therefore, he might have withdrawn from the investigation. Instead, he acquiesced to FBI agents Kahoe and Hultgen, who conditioned his family’s protection upon continued participation, which required forgoing control of his business. “For at least a quarter-century, [the Supreme] Court has made clear that even though a person has no ‘right’ to a valuable government benefit ... for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.”
 
 Perry v. Sindermann,
 
 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). “[T]he government may not require a person to give up a constitutional right— here the right to receive just compensation when property is taken for a public use — in exchange for a discretionary benefit conferred by the government where the property sought has little or no relationship to the benefit.”
 
 Dolan v. City of Tigard,
 
 512 U.S. 374, 385, 114 S.Ct. 2309, 2317, 129 L.Ed.2d 304 (1994). Although the Janowskys may have lacked a right to the benefit of FBI protection, they possessed a constitutionally protected property right in Geno’s Vending. By threatening to withhold protection, especially after informing Timothy Janowsky that he was on a hit list and compromising his cover, the FBI coercively interfered with the Janowskys’ property right. While Janow-sky’s participation may have been elective, there is a genuine issue of material fact as to whether it was voluntary.
 

 Conclusion
 

 Accordingly, we vacate the judgment and remand the case for further proceedings consistent with this opinion.
 

 COSTS
 

 The Janowskys shall have their costs.
 

 VACATED AND REMANDED.
 

 [1]
 

 . We treat the trial court’s dismissal of the taking count for failure to state a claim as summary judgment in accordance with RCFC 56(c).
 
 See
 
 Fed.R.Civ.P. 56(c).
 

 [2]
 

 . Under Fed.R.Evid. 201, we take judicial notice of this from Janowsky’s testimony in
 
 United States v. Kinkade and Mokol,
 
 HCR 89-114 (N.D. Ind. 1990), the criminal trial of a vendor and a police official snared by the investigation. Trial Transcript at 2456-57. We “may take notice of proceedings in other courts ... if those proceedings have a direct relation to the matters at issue.”
 
 See St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp.,
 
 605 F.2d 1169, 1172 (10th Cir. 1979).