# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Engineering Solutions & Products, LLC | )   ASBCA No. 58633 |
| | ) |
| Under Contract No. 000000-00-0-0000 | ) |

APPEARANCES FOR THE APPELLANT:    Richard L. Moorhouse, Esq.
David G. Barger, Esq.
Jozef S. Przygrodzki, Esq.
  Greenberg Traurig, LLP
  McLean, VA

Ryan C. Bradel, Esq.
  Greenberg Traurig, LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
  MAJ Bruce L. Mayeaux, JA
  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

In 2004, appellant Engineering Solutions and Products, LLC (ESP) leased a warehouse from First Potomac Realty Trust (FPRT) to support the United States Army (Army) Program Executive Office (PEO) Soldier.[1] At the time, ESP held a prime contract to provide this warehouse space for government use issued by the Department of the Treasury, Bureau of the Public Debt (BPD), Franchise Services.[2] ESP subsequently provided the warehouse space to the Army as a subcontractor to a series of prime contractors. In late 2005, while ESP was a subcontractor, the Army indicated that it would be interested in leasing more warehouse space at Haymarket, Virginia. ESP subsequently negotiated with the landlord, FPRT, for FPRT to expand the warehouse. ESP entered into a ten-year lease with FPRT, with the base rent

---

[1] Project Manager, Soldier Equipment (PMSEQ) was a program office within PEO Soldier. PMSEQ was later renamed Project Manager Soldier Protection and Individual Equipment (PM SPIE). (Tr. 1/135, 186)

[2] BPD used this contract, and others like it, to obtain property or sources for the benefit of other government agencies (like the Army here) which would, in turn, compensate BPD for its costs.

front-loaded into years one through seven, and no base rent for years eight to ten, and with an early termination fee.

During the negotiations for the expansion of the warehouse, the Army reviewed the construction design to ensure that the new space would meet its needs, helped ESP and FPRT in negotiations with Prince William County, Virginia, planning and zoning officials, and monitored the progress of construction activity. ESP leased the expanded warehouse space beginning in April 2007. The Army vacated the warehouse in March 2012, approximately five years into ESP's ten-year lease with FPRT. ESP contends that there was an implied-in-fact contract with the Army requiring the Army to pay the early termination fee, year six rent, and other costs totaling roughly $4.2 million. ESP submitted a certified claim that was denied by the Army's contracting officer. ESP subsequently appealed to the Board. The Army's motion for summary judgment was denied by the Board on 13 May 2015. *Engineering Solutions & Products, LLC*, ASBCA No. 58633, 15-1 BCA ¶ 35,989, *recon. denied*, 16-1 BCA ¶ 36,313. The Board held a four-day hearing beginning on 19 September 2016. Because we find that ESP has not demonstrated the existence of an implied-in-fact contract with the Army, we deny the appeal in its entirety.

## FINDINGS OF FACT

1. In August 2001, the Department of the Treasury, BPD, Franchise Services (FedSource), awarded Open Market Blanket Purchase Agreement (BPA) No. 4000 to ESP (app. supp. R4, tab 79 at 1, 4; tr. 1/46).

2. FedSource was a "franchise-fund activity" created by the Department of the Treasury. *See* 31 U.S.C. § 322 note (Department of the Treasury Franchise Fund). FedSource awarded its own contracts for goods and services to be provided to other agencies (supp. R4, tab 52 at 171).

3. In April 2004, while ESP was a prime contractor to FedSource it leased approximately 123,777 square feet at a warehouse located at 15395 John Marshall Highway, Haymarket, Virginia (the Haymarket warehouse) (app. supp. R4, tab 85 at 1; compl. ¶¶ 9, 12; tr. 2/59, 65). Preston Turner, a senior logistician for PEO Soldier, initially identified the Haymarket property to ESP as being suitable for the Army's purposes (tr. 2/9-10).

4. The FedSource center in Beaufort, South Carolina (FedSource-Beaufort) issued at least one task order to ESP under BPA No. 4000 which involved a requirement to operate the Haymarket warehouse in support of the Army's PEO Soldier activity (tr. 1/56-57, 2/17). By Military Interdepartmental Purchase Request (MIPR) No. MIPR4L1BR01366, dated 16 August 2004, the PMSEQ activity within PEO Soldier transferred $2,610,908.23 from the Department of Defense to

FedSource-Beaufort, "for lease, transfer/relocation, and maintenance of Haymarket facility" with an expiration of 30 September 2004 (app. supp. R4, tab 80 at 6).

5. In November 2004, the BPD advised ESP that its BPA did not comply with the Federal Acquisition Regulation (FAR), and that FedSource-Beaufort would not issue any new task orders under the BPA (supp. R4, tab 57 at 746). In a 26 March 2005 letter to FedSource BPA holders, BPD informed ESP that the final task order issued by FedSource-Beaufort under BPA No. 4000 would expire no later than 30 April 2005 (id. at 748).

6. In early 2005, notwithstanding, the FAR-related problems with ESP's BPA, the Army apparently still needed to use the Haymarket warehouse, thus the FedSource center in Baltimore (FedSource-Baltimore) awarded a task order to Westaff (USA), Inc. (Westaff) under existing Contract No. TPD-03-C-0005. The FedSource-Baltimore task order required Westaff to operate the Haymarket warehouse for PEO Soldier. Westaff, in turn, entered into a subcontract with ESP for that purpose. (Supp. R4, tab 56 at 349, tab 57 at 775; compl. ¶ 15; tr. 1/58, 61-62). While it was a subcontractor to Westaff, ESP submited its invoices to Westaff for payment (tr. 3/135).

7. Ms. Gerry Mosier, a procurement analyst, also referred to as a contracts manager, was ESP's primary contact within the government during the transition from FedSource to Westaff, but had no contracting authority in her position at PMSEQ (although she had been a contracting officer earlier in her career). She retired from federal service in March 2006. (Supp. R4, tab 60 at 895, tab 63 at 1009; tr. 3/63-64, 159)

8. In approximately late 2005, while ESP was under subcontract to Westaff, representatives of PEO Soldier, including the head of PMSEQ, COL John Norwood (now retired); Steven Pinter, COL Norwood's deputy; and Todd Wendt, PMSEQ's Director of Logistics, visited the Haymarket facility, and told ESP personnel that PEO Soldier could use additional space at the Haymarket warehouse to prepare soldier equipment sets for deployment to Iraq (tr. 1/194-95). The Army's need for additional space was urgent due to the Global War on Terror, and expanding combat operations in Iraq and Afghanistan (tr. 1/145, 147, 155, 192, 2/20-22). PEO Soldier processed body armor and night vision goggles that were mission-critical equipment for the troops (tr. 1/145, 147, 155-56). COL Norwood asked ESP to engage with FPRT to see if the warehouse could be expanded (tr. 1/195). COL Norwood also tasked Mr. Pinter with determining PEO Soldier's requirements and making sure they were met through the contracting process (tr. 4/13). Mr. Pinter helped create the statement of work related to the expanded warehouse at Haymarket (tr. 4/7).

9. The Army's access to the Haymarket warehouse subsequently transitioned to a contractual vehicle with Lear Siegler Services, Inc. (Lear Siegler or LSI). Lear

3

Siegler held a "Rapid Response" (also referred to as R2) indefinite-delivery, indefinite-quantity (IDIQ) contract, which was a contract with a broad scope that supported the Army's command, control, communications, intelligence, and surveillance mission (tr. 3/80-82, 84).

10. Lear Siegler had a pre-existing subcontract with ESP, Subcontract No. 1.06.20.059, with an effective date of 31 January 2003 (supp. R4, tab 66). Effective 6 January 2006 Lear Siegler placed an order with ESP under Subcontract No. 1.06.20.059 to support PMSEQ (supp. R4, tab 67 at 57-58; tr. 3/160). In February 2006, the Army issued a task order to Lear Siegler to provide the expanded warehouse space (R4, tab 3).

11. ESP helped prepare Lear Siegler's Task Execution Plan (TEP)[3] (tr. 2/76; supp. R4, tab 56 at 542), that was submitted as a proposed TEP to the Army Communications-Electronics Command (CECOM) Acquisition Center, at Fort Monmouth, New Jersey, in anticipation of receiving a task order under Lear Siegler's existing R2 IDIQ contract to provide support to PEO Soldier, including services at the Haymarket warehouse (R4, tabs 2-3).

12. In paragraph 1.4 of this TEP, TEP CR-1287, REV.-Original, dated 23 December 2005, Lear Siegler sought to pass to the government liability for any contingent fee for the early termination of ESP's "long term lease agreements," and recognize the fee as a contract cost. Paragraph 1.4 stated:

> Team LSI's pricing includes a twelve (12) month base period and a twelve (12) month option period. Due to the period of performance constraints and the long [term] lease agreements ESP entered into on warehouse/office facilities and materiel handling equipment in support of mission requirements, it should be noted that an early termination fee may be applicable should the Government award this task order to someone other then [sic] LSI/ESP. In addition, the early termination fee is also applicable should PMSEQ award this task order to Team LSI and terminate the effort during the period of performance.

(Supp. R4, tab 62 at 991) ESP wrote the language in paragraph 1.4 (tr. 3/110-13)

13. On 25 January 2006, a CECOM contract specialist wrote to Lear Siegler: "As per the...Contracting Officer, [Debra Abbruzzese],...[p]lease remove the language from your TEP pertaining to an early termination cost under paragraph 1.4. The

---

[3] The Task Execution Plan functions like a bid for a task order.

Government will not pay an early termination cost." (Supp. R4, tab 62 at 984) Ms. Abbruzzese directed that the language be removed from the TEP because, "[i]t was a contingent liability that the Government was not willing to accept" (tr. 3/95).

14. Lear Siegler complied. The changed TEP, denoted as "Rev. -A," was incorporated in Task Order No. 118 and did not include the language about government liability for the contingent fee for early termination of the lease (R4, tab 2 at 2, tab 3 at 21; supp. R4, tab 65 at 1025). Ms. Holderness, a contracts manager at ESP, described her top management, specifically Mr. Livero and Mr. Hoffman, as being of the opinion that "we could address the termination costs at a later date, and if the government didn't want to accept it at a later time, that we could put in a claim" (tr. 3/143-44).

15. CECOM awarded Task Order No. 118 to Lear Siegler on 1 February 2006, on a time and material basis (R4, tab 3 at 2). On 27 February 2006, the Army issued a no-cost, unilateral modification to change the effective date of the award from 1 February to 6 January 2006 (R4, tab 5). Lear Siegler's initial performance period under Task Order No. 118, as modified, ran until 31 January 2007, with a one-year option (R4, tab 3 at 2, tab 5).

16. Lear Siegler's base contract was funded in two-year increments, while the task order was funded annually (R4, tab 1 at 2-6, tab 3 at 2).

17. The TEP CR-1287, REV.-A as incorporated into Task Order No. 118 stated that "ESP is currently negotiating with lending sources relative to expansion of the Haymarket facility to 240,000 square feet." The Army accepted Lear Siegler's request to subcontract with ESP for the Haymarket warehouse and approved, as pass-through direct costs, ESP's monthly rent of $198,721.43 for the base year, with an increase to $271,142.12 for the option year, reflecting the timetable of the proposed warehouse expansion. (R4, tab 3 at 2, 17, 38)

18. The Task Order No. 118 Performance Work Statement (PWS) required in part that:

> 3.3.1 The contractor shall identify storage space at Haymarket, Virginia to support staging facility supply, maintenance, packaging, storage, handling and transportation requirements in response to military demand for PM Soldier Equipment. The facility shall also have the capability to support inventory management actions,

5

property accountability functions and warranty
maintenance actions.

(R4, tab 3 at 12)

19. The TEP CR-1287, REV.-A addressed this requirement as follows:

> The Haymarket facility is commercial space leased by ESP
> in support of PEO Soldier and PMSEQ requirements. The
> facility is designed to support staging facility operations
> and office space requirements. The facility consists of
> 123,000 square feet in its current configuration. The
> facility is approved for expansion to 240,000 square feet,
> which ESP is currently negotiating with the building
> owner.... ESP understands there will be no construction
> under this task order.

(R4, tab 3 at 29)

20. Task Order No. 118 required Lear Siegler to provide the expanded warehouse space at Haymarket to support PMSEQ (R4, tab 3 at 9, 11-12, 26-27, 29). Lear Siegler, in turn, placed orders with ESP to provide the use of the Haymarket warehouse to perform Task Order No. 118 (supp. R4, tab 67). Lear Siegler included in the order it placed with ESP the same PWS that was in its own task order with the government (tr. 3/148-51).

21. On 9 February 2006, representatives of the Army (including Mr. Preston Turner, Ms. Gerry Mosier, and Ms. Deborah Shreve from PEO Soldier), ESP (including Mr. Thomas Reed and Ms. Jan Holderness), and Lear Siegler held a "Task Order 118 (TO) Kickoff Meeting" at ESP's offices in Eatontown, New Jersey (supp. R4, tab 60 at 974). Mr. Turner was the senior logistician for PMSEQ (tr. 1/135-36). Mr. Reed, ESP's project leader, was the primary interface with PMSEQ personnel about operating the Haymarket warehouse (tr. 2/6, 9). He mainly dealt with Mr. Turner (tr. 1/143, 2/9-10, 20, 26). A briefing slide presented at the kickoff meeting, and emailed to the Army the following day, stated that one "Team ESP Focus" in the base year would be "[c]ompletion of the 112,000 sq ft expansion to existing Haymarket Warehouse" (supp. R4, tab 60 at 974, 978). The purpose of having this language in the briefing slide was to announce that the warehouse expansion was a task to be completed under Task Order No. 118 (tr. 2/91).

22. Mr. Turner, who worked for Mr. Wendt, the PMESQ director of logistics, was assigned by his organization to monitor the buildout. He tracked the monthly rent for the warehouse (tr. 1/169-70, 174-75, 191) reviewed the planning drawings when

6

they were provided to him by ESP, and provided assistance to ESP's landlord in dealing with Prince William County officials about the buildout (tr. 1/171, 209-10, 212-13, 2/25-26, 30, 36-37). Mr. Wendt also reviewed the drawings when they were presented to him by ESP, but gave no direction regarding the layout of the facility (tr. 1/226, 2/33).

23. Mr. Hoffman, the founder of ESP and the company's president and CEO at the time of these events, was a former GM-15 Deputy Director of Logistics at CECOM, and a member of the Army Acquisition Corps. He received training related to his duties with the Army and was aware that only a warranted contracting officer could make a binding commitment on behalf of the government. (Tr. 1/21, 35-37, 52, 54, 64)

24. According to Mr. Hoffman, ESP renegotiated the warehouse lease and Mr. McGrory, the ESP chief financial officer, was the lead negotiator (tr. 1/100). Mr. Hoffman insisted that ESP would not have entered the renegotiated lease absent direction to do so by the Army (tr. 1/30). However, Mr. Hoffman was never a party to a conversation where Army personnel directed ESP to enter into the renegotiated lease (tr. 1/103-04). Although Mr. Hoffman believed Army personnel knew the terms of the lease, he did not know that for a fact and he was not sure which Army personnel knew which terms of the renegotiated lease (tr. 1/42, 101). He also did not know whether Army personnel were ever given a copy of the lease (tr. 1/75).

25. Although Mr. Hoffman testified that assurances were given that "ESP would not be responsible for any payments for which we had no use at the facility for," he was not the recipient of such assurances and never stated exactly who within ESP ever received such assurances from Army personnel (tr. 1/30-31). When asked who within the Army conveyed such assurances to ESP personnel, he stated, "I do know Preston Turner was involved. I can't speak with certainty as to who his associates were." (Tr. 1/31)

26. Mr. McGrory, testified that Mr. Hoffman was the recipient of assurances from Army program personnel; the only information Mr. McGrory had about any assurances from Army personnel, however, came from Mr. Hoffman (tr. 3/27, 38-39).

27. Mr. Hoffman testified that the renegotiated lease term which provided that all the rent to be paid in the first seven years, with the last three years being rent free, was in the lease because "we were given the impression that [PMSEQ] would be in there for an extended period, seven years or longer" (tr. 1/33).

28. Mr. Turner recalls having a conversation with Mr. Hoffman in either 2005 or 2006. He recalls saying that the requirement "will probably be going on until 2010 or whatever like that." (Tr. 1/181) Mr. Reed, who was employed by ESP until

October 2006, and who was the primary interface with Mr. Turner, never received any commitment about how long PMSEQ might require the Haymarket warehouse (tr. 2/103, 107). He did "expect" that the requirement would exist even after Task Order No. 118 was completed (tr. 2/121).

29. ESP was motivated to enter into the renegotiated lease because it believed that this step would allow it to grow (tr. 2/23, 47-49). Mr. McGrory was involved in the financial aspects of the warehouse expansion. He testified that the guidance he was given by Mr. Hoffman was to ensure that whatever was done was good for the company and good for the workforce. (Tr. 3/12-14, 37-38) The renegotiated lease was a financial aspect of ESP's expansion (tr. 3/13-14). Mr. Hoffman recognized that there was a risk that the Army would not stay for the duration of the lease because the ten-year term gave the Army time to provide the function internally (tr. 1/30, 98).

30. Ms. Holderness prepared a draft letter to PEO Soldier, dated 6 January 2006, that apparently was never sent, but which stated in pertinent part:

> *Appreciating that the sole purpose in ESP's pursuit of the build-out initiative is in response to PEO Soldier direction, ESP requests PEO Soldier concurrence with the following prior to executing the proposed leasing agreement with First Potomac:*
>
> — *Acceptance of the lease terms and conditions relative to security and other deposits/rent/rent escalation/Common Area Maintenance charges/occupancy terms.*
>
> — *Acceptance that ESP will invoice all remaining lease and associated payments in the event that PEO Soldier does not require the facility (or portions thereof) through the end of the leasing period.*
>
> — *An acknowledgement that ESP's agreement to lease the build-out facility is contingent upon ESP being the sole provider of material handling equipment and the personnel resources necessary to operate*

8

*the staging facility operation during the*
*leasing period.*

(Supp. R4, tab 60 at 892-93) Ms. Holderness agreed that at the time she prepared the draft letter, the final terms of the renegotiated lease were not known (tr. 3/137).

31. On 20 January 2006, via email, ESP's upper management, including Mr. Hoffman and Mr. McGrory, discussed difficulties faced with its landlord, FPRT. FPRT had notified ESP that it might suspend the architectural design of the warehouse buildout. As a result, ESP personnel discussed what their alternatives might be. (Supp. R4, tab 56 at 421) As Mr. Hoffman testified: "That is what I wanted to open the door on to talk to Preston about. Like hey, if we can't get to the finish line with First Potomac to satisfy everybody's requirements, then we have got to look in a different direction." (Tr. 1/83)

32. On 11 April 2006, ESP entered into a new lease for the Haymarket warehouse with FPRT (supp. R4, tab 57 at 828-29; compl. ¶ 12). Ms. Holderness, the ESP contracts manager, signed for ESP (tr. 3/104-05). The lease on the warehouse that had been signed in June 2004, was terminated upon the execution of the renegotiated lease. As Mr. Hoffman explained, the old lease and the renegotiated lease "became one lease." (Supp. R4, tab 57 at 836, ¶ 2.06; tr. 1/103)

33. The lease that ESP signed in April 2006 provided for the expansion of the Haymarket warehouse by the landlord and a substantial increase in rent upon the completion of the expansion, as anticipated in Lear Siegler's Task Order No. 118 (supp. R4, tab 57 at 829-30).

34. Mr. Reed disclosed to Mr. Turner the monthly lease amounts for the renegotiated lease (tr. 1/163, 174-75). Mr. Turner provided his "concurrence" with the lease costs and provided the information to the contract manager, Ms. Shreve, for her review (tr. 1/165). However, Mr. Turner clarified that his concern was with the buildout and monthly rent, and that he did not recall a discussion of the lease terms and did not relay his discussion with Mr. Reed to the contracting officer (tr. 1/174-75, 180). Mr. Turner lacked contracting authority (tr. 1/169, 176-77). Mr. Reed's primary points of contact in PMSEQ for invoices and estimates were Ms. Shreve and Ms. Mosier (tr. 2/118). Ms. Shreve was a program analyst who worked with Ms. Mosier until her retirement. Ms. Shreve had no contracting officer authority. Ms. Mosier, like Ms. Shreve, was a program analyst but was referred to by the title of contract manager. Like Ms. Shreve, Ms. Mosier had no contracting authority. (Tr. 3/62-63, 68; supp. R4, tab 63) In fact, no one assigned to PMSEQ had any contracting authority (tr. 1/176, 3/63-64, 4/10-11). Ms. Shreve reviewed ESP's invoices, but at some point Mr. Turner became involved in that task with her (tr. 3/77).

9

35. Mr. Reed testified that he had provided a draft copy of the renegotiated lease to Mr. Turner (tr. 2/41, 45).

36. Mr. Reed had no recall that the lease terms provided that all the rent would be paid in the first seven years, and that the last three years of the lease were rent free (tr. 2/96-97). Mr. Reed believes he mentioned the $600,000 early termination amount to Mr. Turner in emails (tr. 2/100-01). Mr. Reed was not deeply involved in negotiating the termination provisions of the renegotiated lease; that was instead the purview of Mr. Hoffman and Gary Livero (tr. 2/98-99).

37. Although Mr. Reed testified that he told Ms. Shreve the same details about the renegotiated lease that he had told to Mr. Turner (tr. 2/111-12), Ms. Shreve never attended any meetings regarding the leasing arrangements and was never privy to any of the details of the lease (supp. R4, tab 63; tr. 3/68-69).

38. Ms. Shreve testified to a conversation with either Mr. Decesare or Mr. Livero, of ESP. The individual expressed concern about entering into a ten-year lease for the expanded warehouse in light of the fact that the government's task order at the time had a twelve month performance period, and the government funding was for that same period of time. Ms. Shreve testified that she responded by saying, "it was our intentions to continue to use it, but that we couldn't guarantee anything because we only got funding on a year-to-year basis, and only if we had a requirement, so, you know, I can't guarantee anything after 12 months." She advised the individual that ESP needed to make a business decision about whether or not it would lease the facility for that period. (Supp. R4, tab 63; tr. 3/69-70, 75)

39. Mr. Pinter testified regarding a conversation with ESP about the structure's expansion. Mr. Pinter testified that ESP explained that "they had to sign a ten year lease for the facility and they wanted the Government to sign a ten year contract." Mr. Pinter explained that the government could only sign a base year with options. (Supp. R4, tab 61; tr. 4/8-9, 10)

40. Testimony by ESP's witnesses was uncontroverted, that in April 2006 when the renegotiated lease was executed, it was not possible to know when any of the lease years would begin or end because those dates could only be determined once construction was completed (tr. 2/103-04, 3/42, 155-56).

41. At the time of the renegotiated lease, ESP was working under a subcontract with Lear Siegler that needed to be "recompeted" in about two years. There was no guarantee that ESP would be successful in that re-competition. (Tr. 3/45)

42. Mr. Turner testified that he did not see a copy of the renegotiated lease until between 2010 to 2012 (tr. 1/173-74, 175) and did not recall discussing the early

10

termination provisions of the renegotiated lease with Mr. Reed, nor did he recall being informed about the $600,000 early termination fee amount (tr. 1/175). Mr. Wendt, Mr. Turner's supervisor, never saw the lease until litigation commenced in 2012 (tr. 1/224). He first learned that ESP had signed a long-term lease in 2007, after the buildout construction was completed (tr. 1/223-24).

43. No evidence was presented that PMSEQ personnel, or any other Army personnel, ever gave ESP direction to enter into the renegotiated lease (tr. 1/177, 197-99, 2/50, 4/11, 29, 43-44). At most, there was evidence that PMSEQ personnel were interested in the timing of the buildout and when the expanded space would be available for use (tr. 1/201, 2/50).

44. In December 2006, the Army issued a no-cost, unilateral modification extending the term of Task Order No. 118 from 31 January to 31 March 2007 (R4, tab 11).

45. In March 2007, the Army exercised an option to extend Lear Siegler's performance of Task Order No. 118 through 4 March 2008 (R4, tab 14).

46. On 25 April 2007, ESP and FPRT signed a First Amendment to Deed of Lease for the Haymarket warehouse. The First Amendment to Deed of Lease stated that it related to "a Deed of Lease dated April 11, 2006." (App. supp. R4, tab 85 at 1-2)

47. The April 2007 First Amendment to Deed of Lease stated that the landlord had expanded the Haymarket warehouse from approximately 123,777 square feet to approximately 236,082 square feet, and that ESP would occupy the expanded space for ten years, from 1 April 2007 through 31 March 2017. The amended lease agreement specified monthly base rent for the first seven years (through 31 March 2014), but no base rent for years eight through ten, although ESP agreed to pay, as "additional rent," its share of operating expenses and real estate taxes, and to pay for all utilities, in all years. (App. supp. R4, tab 85 at 1-4)

48. On 4 March 2008, the Army issued a no-cost, unilateral modification extending Lear Siegler's performance period under Task Order No. 118 from 4 March through 31 March 2008, to avoid a lapse in service pending the award of a follow-on task order (R4, tab 18).

49. On 1 April 2008, the CECOM Acquisition Center awarded Lear Siegler time-and-materials Task Order No. 200 under Contract No. DAAB07-03-D-B010. The task order requirements included operating the Haymarket warehouse for PMSEQ. Lear Siegler's initial performance period under Task Order No. 200 ran

from 1 April 2008 through 31 March 2009, with a one-year option. (R4, tab 19 at 1-2, tab 20 at 17)

50. In paragraph 1.4 of its initial TEP proposal for Task Order No. 200, Lear Siegler again sought to pass through a contingent fee for the early termination of ESP's long-term lease as a contract cost. That contingent fee was rejected by the R2 contracting officer for Task Order No. 200, Ms. Fernandes. (Supp. R4, tab 68 at 8, tab 69; tr. 3/127-28) In response, Lear Siegler submitted a revised TEP in which the contingent fee language in paragraph 1.4 was removed and the following statement was inserted: "ESP CONCURS WTTH THIS CHANGE" (supp. R4, tab 70 at 1224; tr. 3/127). The revised TEP with the contingent termination fee language deleted was included in Task Order No. 200 (R4, tab 19 at 2, ¶ 4; supp. R4, tab 70; tr. 3/123).

51. On 1 April 2009, the Army exercised the option to extend Lear Siegler's performance period under Task Order No. 200 through 31 March 2010 (R4, tab 22).

52. The Army subsequently obtained access to the Haymarket warehouse through a different contractual vehicle. On 5 March 2010, the U.S. Army Research, Development and Engineering Command (RDECOM) Acquisition Center, Operations Branch, at Aberdeen Proving Ground, Maryland, entered into bilateral Modification No. 1206 to Task Order No. 0012 under Engility Corp.'s existing Contract No. W91CRB-06-D-0037. The requirements of this task order modification included operating the Haymarket warehouse for PMSEQ on a time-and-materials basis. The performance period was from 26 February 2010 through 8 July 2011. (R4, tab 26 at 1, 5)

53. Engility entered into two subcontracts with ESP relating to the Haymarket warehouse with effective dates of 26 February 2010 (Subcontract No. 2010-1484) and 8 June 2011 (Subcontract No. 11-129) (supp. R4, tabs 75, 76). Both subcontracts stated that Engility would issue purchase orders for specific requirements. The record contains one purchase order placed under Engility Subcontract No. 2010-1484. It had an initial performance period of 26 February 2010 to 20 August 2010. (Supp. R4, tab 72 at 001-02)

54. On 24 March 2011, the U.S. Army Contracting Command-Aberdeen Proving Ground (ACC-APG) in Maryland, awarded Engility cost-plus-fixed-fee Contract No. W91CRB-11-C-0074 for support services to PEO Soldier, including the operation of the Haymarket warehouse, from 24 March 2011 through 23 January 2012 (R4, tab 27; compl. ¶ 21).

55. In November 2011, the Army and Engility bilaterally extended the term of Contract No. W91CRB-11-C-0074 to 23 March 2012 (R4, tabs 27, 28; tr. 4/19-20).

12

56. On 9 January 2012, the ACC-APG contracting officer informed Engility that the Army would not require the Haymarket warehouse after Contract No. W91CRB-11-C-0074 expired on 23 March 2012 (R4, tab 31).

57. In February 2012, ESP submitted Invoice No. 1097-11 to Engility. The invoice sought $638,400.00 for a termination fee under ESP's lease for the Haymarket warehouse. Engility asked the ACC-APG contracting officer for approval to pay the ESP invoice as "other direct costs" under Contract No. W91CRB-11-C-0074. The Army advised Engility that it did not consider the lease-termination fee an allowable cost. (R4, tab 36 at 1, 3; compl. ¶ 29)

58. The Army vacated the Haymarket warehouse on 23 March 2012 (compl. ¶ 35).

59. ESP later submitted an "invoice [to Engility] for the total amount of rent for Year 6 through March 31, 2013, plus G&A, for a total amount of $4,186,128.99." ESP alleges that Engility did not pay that invoice, and it is undisputed that the Army did not pay Engility for these costs. (Compl. ¶¶ 28-29; answer ¶¶ 28-29)

60. Both Task Order Nos. 118 and 200 which were issued to Lear Siegler were fully performed. So was Task Order No. 0012 under Engility's existing Contract No. W91CRB-06-D-0037 and Contract No. W91CRB-11-C-0074 which was awarded to Engility. (Tr. 4/24) All of the orders placed with ESP by Lear Siegler under Task Order No. 118 and Task Order No. 200 were fully performed (tr. 3/164-65). The two ESP subcontracts with Engility were fully performed (supp. R4, tabs 75, 76; tr. 3/168-69, 4/58).

61. Mr. Hoffman testified that ESP invoked the early termination provision of the renegotiated lease and that he was probably the person in ESP who did so (tr. 1/126).

62. On 6 December 2012, ESP submitted a certified claim to ACC-APG for $3,317,728.88 in "rent and other associated costs" allegedly paid by ESP to FPRT for the Haymarket warehouse from 26 March 2012 through 3 December 2012 (supp. R4, tab 56 at 327, 333). The stated basis of the claim was that an implied-in-fact contract arose between ESP and the Army and that the Army had constructively terminated that contract, giving rise to a right on the part of ESP to recover termination for the convenience of the government costs (*id.* at 333).

63. In response to a telephone request by Jeffrey Schoerner, the ACC-APG contracting officer, that ESP identify who from the Army "directed" ESP to enter into the 2007 lease amendment and "direct[ly] participa[ted] in...the [lease] negotiations...."

13

Mr. Earl Thompson, ESP's Vice President of contracts, identified COL Norwood, Mr. Wendt, and Ms. Shreve. (R4, tab 37 at 3-7)

64. Mr. Schoerner issued a final decision denying ESP's claim on 5 April 2013. He concluded that ESP had no prime contract with the government to provide the Haymarket warehouse between April 2006 and April 2007, and that ESP had supplied no "evidence that any Government communication existed in any form directing that ESP enter into a 10-year leasing agreement for the Haymarket, VA facility." (R4, tab 44 at 1-2)

65. On 24 April 2013, the Board docketed ESP's timely appeal as ASBCA No. 58633.

## DECISION

ESP asserts that it was party to an implied-in-fact contract with the Army to expand the Haymarket warehouse and to lease the warehouse for at least seven years. ESP, as the party asserting the existence of an implied-in-fact contract, bears the burden of establishing by preponderate evidence the existence of a contract. ESP's theory of an implied-in-fact contract has evolved since it first submitted its certified claim; however, ESP has not demonstrated the existence of an implied-in-fact contract, under of any the various permutations of its legal theory. Instead, the record evidence demonstrates that the Army indicated to ESP that it desired more warehouse space at the Haymarket facility. ESP, seeking to please the Army, negotiated with its landlord to expand the warehouse. The landlord, FPRT, indicated that it would be willing to expand the warehouse if ESP would commit to a ten-year lease. ESP recognized that there was a risk that the Army would not stay in the facility for ten years. The Army informed ESP that it could only commit appropriated funds and could not commit to more than a one-year lease, but that it intended to lease the property for several years.

ESP attempted to mitigate its risks by structuring its lease with FPRT such that the ten years of base rent were payable over the first seven years, and by including an early termination clause. ESP attempted to include in the contract between its prime and the Army a provision that would make the Army liable for payment of the early termination fee, but ESP's proposal was rejected by Army contracting officers -- not once, but twice. ESP presented no evidence that anyone from the Army shared in ESP's understanding of the terms of its asserted implied-in-fact contract. ESP's argument is further undercut by the fact that its CEO was a former member of the Army Acquisition Corps and was aware that only a contracting officer could bind the Army.

In total, the evidence demonstrates that ESP made a business decision to enter into a ten-year lease with FPRT for the expansion of the Haymarket warehouse in

14

order to grow the company, under the assumption that Army would stay in the warehouse long enough to make ESP's lease profitable. In the end, the Army stayed five years, rather than the seven years ESP had hoped for. The fact that ESP's gamble did not pay off does not create an implied-in-fact contract.

## I.    Implied-In-Fact Contracts

In order to establish the existence of an implied-in-fact contract with the United States, ESP must establish the same elements as for a written contract: 1) mutuality of intent to contract; 2) consideration; 3) unambiguous offer and acceptance; and 4) actual authority on the part of the government representative whose conduct is relied upon. *See, e.g., City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Like an express contract, an implied-in-fact contract must be based upon a meeting of the minds; however, the meeting of the minds is "inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Trauma Service Group v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (quoting *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996)); *United Pacific Insurance Company*, ASBCA No. 53051, 03-2 BCA ¶ 32,267 at 159,624.

ESP asserts that it can establish the existence of an implied-in-fact contract by establishing 1) government direction to perform work, 2) performance by appellant, and 3) a contracting officer's tacit ratification by accepting the work (app. br. at 15) (citing *Kaiser Marquardt*, ASBCA No. 50177, 97-2 BCA ¶ 29,169 at 145,037). ESP's interpretation of *Marquardt* as providing an alternate means of establishing the existence of an implied-in-fact contract is not well grounded. In *Marquardt*, the Board denied a motion to dismiss, holding that appellant had made allegations that, if proven, would establish that it was ordered to perform work beyond the scope of the existing contract, and that the contracting officer ordered appellant to continue with the work. *Id.* The Board noted that an implied-in-fact contract required proof of the same elements as an express contract including offer, acceptance, and consideration. *Id.* The decision then noted that an implied-in-fact contract *may arise* from direction, performance and tacit ratification, citing the Board's holding in *Digicon Corporation*, ASBCA No. 36907, 89-3 BCA ¶ 21,966 at 110,497. *Id.* However, *Marquardt* does *not* say that these three elements *are sufficient* only that they *may be sufficient* to demonstrate an implied-in-fact contract. *Digicon* also makes clear that appellant must satisfy the same contractual requirements as an express contract. *Digicon*, 89-3 BCA ¶ 21,966 at 110,497. In *Digicon*, the Board found that the necessary elements of offer, acceptance, consideration and authority were established by the government's direction to appellant to perform a service not covered by the contract, appellant's compliance with the direction, and tacit acceptance by the contracting officer. *Id.* Thus, we hold that ESP must establish the traditional elements of a valid government contract, including offer, acceptance, consideration and authority, but recognize that one or more of these elements may be proved by direction, performance, or tacit ratification.

15

II.     ESP has Not Established Authority or Mutuality of Intent to Contract on the Part of the Army

The Army asserts that ESP cannot establish any of the elements of an implied-in-fact contract. As the failure to establish any one of the elements of an implied-in-fact contract is fatal to ESP's claim, we concentrate on the authority and mutuality of intent to contract issues because the record is clear on these points. We find that ESP has not established that anyone with authority to bind the government was a party to the alleged implied-in-fact contract. *See, e.g.*, *City of El Centro*, 922 F.2d at 820-21; *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947). ESP did not present testimony establishing an understanding between ESP and any government official, let alone any government official with authority to bind the government, that the government would lease the Haymarket warehouse for seven years, or that the government would pay the early termination fee for the lease.

The only actions by authorized contracting officers in the record regarding ESP's alleged implied-in-fact contract were Ms. Abbruzzese's request, prior to ESP entering into the lease with FPRT for the expanded warehouse, that Lear Siegler *delete* the proposed contract language providing that the Army would be liable for an early termination fee (findings 11-14), and the similar request by Ms. Fernandes in 2008 when the Army issued a new task order to the prime contractor (finding 50). Rather than establishing authority, these actions demonstrate the absence of a mutual intent to contract. Additionally, Mr. Pinter, who was superior to Mr. Turner, informed ESP that the Army could only commit to a one-year base contract with options (finding 39).

ESP's witnesses did not testify to actions by government employees possessing authority. Instead, ESP's witnesses were only able to testify that other ESP employees had an understanding that the Army would commit to a seven-year lease (findings 25-26). While Mr. McGrory testified that Mr. Hoffman received reassurances from the Army, Mr. Hoffman himself testified that he had not received any such assurances (*id.*). Mr. Hoffman thought that assurances were provided, but could only identify Mr. Turner as being involved in the assurances. Mr. Turner lacked contracting authority. (Finding 34) Moreover, Mr. Hoffman was a former deputy director of logistics with the Army and understood that only a warranted contracting officer could bind the government (finding 23).

No witness testified to a shared understanding with an Army official. At most, the ESP witnesses testified that they unilaterally possessed an "understanding" that the Army would stay in the warehouse for seven years, but they were unable to identify any government official with contracting authority that shared in that understanding. In fact, none of the Army officials that ESP employees interacted with had contracting authority. (Finding 34) When ESP submitted its certified claim, the contracting

16

officer asked ESP to identify the Army employees that purportedly directed ESP to enter into the lease and participated in the lease negotiations. ESP identified COL Norwood, Mr. Wendt, and Ms. Shreve. (Finding 63) None of these individuals possessed contracting authority (finding 34). Moreover, as detailed above, neither did Mr. Turner or the contracting specialists at PEO Soldier that interacted with ESP (finding 34). Thus, ESP cannot establish the existence of an implied-in-fact contract with an individual possessing contracting authority. *City of El Centro*, 922 F.2d at 820-21.

ESP argues that even if the Army officials did not possess contracting authority, they possessed inherent contracting authority, or that there was a ratification of the implied-in-fact contract. Both of ESP's arguments fail. ESP cannot establish that any of the individuals that they interacted with possessed inherent contracting authority. Specifically, ESP asserts that Preston Turner, at the time a senior logistician with PEO Soldier, possessed inherent authority (app. br. at 22). An individual, who is not a contracting officer can be found to possess "inherent" contracting authority when contracting is an "integral" and indispensable part of their jobs. *See, e.g., H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989); *Todd Pacific Shipyards Corp.*, ASBCA No. 55126, 08-2 BCA ¶ 33,891 at 167,756. However, here the record demonstrates that contract administration was handled by CECOM and that none of the PEO Soldier employees were involved in administering the contract (findings 11, 13, 15, 34).

There was no evidence presented in the hearing that Mr. Turner possessed any inherent contracting authority. Instead, the record demonstrates that his role was to monitor the buildout, but there was no evidence that Mr. Turner acted as contracting officer. (Finding 22) The fact that Mr. Turner reviewed invoices before payment (finding 34) does not change this conclusion. Additionally, ESP cites to Mr. Turner's testimony that he "concurred" with the lease terms (app. br. at 22). Given the totality of the testimony in the appeal, it appears that Mr. Turner's "concurrence" signified that PMSEQ, as a program office, did not object to the dollar amount for the monthly lease payment that would be passed through the prime contractor to the Army (finding 34). ESP additionally cites to Mr. Turner's testimony that he went back to Ms. Shreve for her concurrence. However, Mr. Turner also testified that he did not pass any of this information on to the contracting officer. (Finding 34) Thus, in total, the evidence does not support a finding that Mr. Turner assented to an agreement that the Army would occupy the warehouse for a set period of years. Although knowledge is not necessary to establish a lack of authority (see *Federal Crop Ins.*, 332 U.S. at 385), here, Mr. Hoffman, the former CEO of ESP was a former deputy director of logistics with the Army and was aware that only a warranted contracting officer could bind the government (finding 23). Thus, it would not have been reasonable for ESP to rely on anything that Mr. Turner may or may not have said.

17

ESP's second argument, with respect to contracting authority, that there was a ratification, fares no better. ESP actually makes two interrelated arguments regarding ratification: 1) that there was an institutional ratification; and 2) that the contracting officer's acceptance of the benefits of the expanded warehouse constituted a ratification. ESP's institutional ratification argument relies on the holding in *Silverman v. United States*, 230 Ct. Cl. 710 (1982). In that case the plaintiff court reporter was a subcontractor on a contract with the Federal Trade Commission (FTC) to transcribe hearings. Silverman had not been paid for several transcripts previously provided to the prime contractor and was concerned regarding the prime's financial viability. Because of this, Silverman sent the transcripts for two days of hearings to the prime contractor c.o.d., and the prime contractor rejected the shipment. Silverman contacted the FTC, informing it of the status of the transcripts and requesting that the FTC not make any further payments to the prime contractor until Silverman was paid for previously delivered transcripts. The FTC official promised to pay directly to Silverman any amounts still due the prime contractor for the previously-furnished transcripts and payment for the two days of transcripts currently being withheld by Silverman in consideration for Silverman providing the transcripts directly to the FTC, rather than providing the transcripts to the prime contractor. *Id.* at 703-07.

The trial judge made factual findings, adopted by the Court of Claims, that offer, acceptance, and consideration were evident in the FTC official's offer to pay directly to Silverman the funds for transcripts not previously paid to the prime contractor in exchange for Silverman releasing the two days of hearing transcripts directly to the FTC. The trial judge also found that the FTC had ratified the implied-in-fact agreement by accepting the transcripts. *Silverman*, 230 Ct. Cl. at 710 ("the FTC ratified such promise").[4] To the extent that *Silverman* is relevant here, it can be distinguished by the express ratification of the agreement between Silverman and the FTC official. This is supported by the holding in *City of El Centro* where the Federal Circuit interpreted *Silverman* as being an implied-in-fact contract that was ratified by an express agreement with an official possessing inherent authority. *City of El Centro*, 922 F.2d at 821 ("By contrast, in the case before us there was no promise, certainly no express promise, by an official empowered to bind the Government"); *see also Aero-Abre, Inc. v. United States*, 39 Fed. Cl. 654, 658 (1997) (in *City of El Centro* the Federal Circuit "construed *Silverman* not as a case in which a government agency ratified an unauthorized agreement, but as one in which the contracting employee had implied actual authority to bind the government"). As noted above, unlike in

---

[4] However, the trial court judge explicitly found that the FTC official lacked contracting authority. *Silverman*, 230 Ct. Cl. at 707. One commentator has referred to the "appellate decisions dealing with the 'authority' issue in implied-in-fact contract cases" as "[a] [m]ess." "Implied-In-Fact Contracts: The 'Authority' Stumbling Block." 14 CIBINIC & NASH REPORT ¶ 5 (Jan. 2000).

*Silverman* it is clear that there was no meeting of the minds between ESP and the Army as the Army twice rejected ESP's efforts to insert language into the prime contract with the Army to make the Army liable for a prepayment penalty (findings 13-14, 50).

ESP also cites *Janowsky v. United States*, 133 F.3d 888 (Fed. Cir. 1998) in support of its institutional ratification argument (app. br. at 20-21). However, the facts in *Janowsky* differ significantly from this appeal. *Janowsky* was a procedural decision in which the plaintiff owned a vending machine business and was concerned with a possible decline in business value if he cooperated with the FBI on a sting operation. *Janowsky*, 133 F.3d at 890-91. Janowsky received a verbal promise of indemnification from an FBI agent who lacked authority, and also had his lawyer prepare a written agreement, with input from the FBI. *Id.* The FBI allowed the undercover operation to continue, and not until after capturing one of the targets of the probe did the FBI inform Janowsky that he would not receive the promised indemnification. *Id.* at 891. The Federal Circuit held that it was error for the Court of Federal Claims to grant summary judgment because there was a factual issue regarding whether the FBI had institutionally ratified the agreement. *Id.* Significantly, the Federal Circuit again interpreted *Silverman*, this time backing-off the interpretation of *Silverman* contained in *City of El Centro* and suggesting that the holding in *City of El Centro* was premised on the fact that the government did not receive a direct benefit from the implied-in-fact contract in that case, whereas it had received a direct benefit in *Silverman*. *Id.*

Regardless of how *Silverman* is interpreted, ESP has not established institutional ratification. Rather than ratifying a purported understanding of the parties that the Army would compensate ESP for early termination costs, the Army *rejected ESP's attempt to include this purported agreement in the contract* (findings 13-15, 32). Significantly, this action occurred *before* ESP signed the lease with its landlord FPRT. The Army again rejected this proposed contractual provision in 2008, after ESP entered into the lease agreement with FPRT. (Finding 50) The widespread institutional rejection of the contract terms proposed by ESP foreclose any finding of institutional ratification of such terms (findings 38-39).

In a related argument, ESP alleges that the contracting officer's acceptance of the benefits of an implied-in-fact contract can constitute ratification. Here, ESP relies upon *Healthcare Practice Enhancement Network, Inc.*, VABCA No. 5864, 01-1 BCA ¶ 31,383 at 154,986, which in turn cites *Sociometrics, Inc.*, ASBCA No. 51620, 00-1 BCA ¶ 30,620. However, these cases are easily distinguishable as they involve novice contractors in situations where it should have been clear to the contracting officer that services were being provided without a contract. In *Healthcare Practice Enhancement*, a Veterans Administration (VA) official without contracting authority retained, by written agreement, consultants to assist in preparing a strategic plan. The

VABCA found ratification of the express but unauthorized contract because the contracting officer attended meetings with the consultants and the committee, of which the contracting officer was a member, sought and received the benefits of the consultants' work. *Healthcare Practice Enhancement*, 01-1 BCA ¶ 31,383 at 154,987. As the Veterans Board noted in that appeal,

> We conclude that, in cases in which a Government official, though lacking actual contracting authority, enters into an agreement with a contractor to provide something of value that the Government needs and receives as a benefit, and *either* an authorized CO knew or should have known about it (*Williams*) *or* the non-authorized Government official who entered the agreement was a senior, or high level, official (*Silverman*), then the Government is liable to compensate the contractor.

*Id.*

The facts in this appeal differ from *Healthcare Practice Enhancement* in that there is no written but invalid agreement between ESP and the Army. While ESP argues that the Army's contracting officer, as in *Healthcare Practice Enhancement*, was aware of the benefits of the contract, the record here does not support such an argument. First, the contracting officers were in CECOM and were physically isolated from the Haymarket warehouse, and not in regular contact with ESP, a subcontractor to a series of prime contractors (findings 11, 34). Additionally, here, the Army's contracting officer paid the prime contractor for the use of the Haymarket warehouse (findings 20, 49, 54). ESP fails to explain how, simply by possibly having seen a copy of the lease agreement (a subject of conflicting testimony (findings 24, 34-37, 42)) between ESP and FPRT, the contracting officer was aware of the purported implied-in-fact contract between ESP and the Army, when the Army was paying the prime contractor for the provision of the same benefit – the use of the Haymarket warehouse.

*Sociometrics* is largely similar to *Healthcare Enhancement Practice*. In *Sociometrics*, the Defense Technical Information Center (DTIC) retained appellant for assistance with its annual fall and spring conferences. There was an express contract with a series of option years. After the government exercised the first three option years, Sociometrics erroneously believed that DTIC had awarded the fourth option year, when, in fact, the government had not exercised the option. The contracting officer's representative continued working with Sociometrics in hosting the fall conference as if the option had been exercised, and this knowledge was imputed to the contracting officer by the Board in holding that there was an implied-in-fact contract, ratified by the contracting officer's acceptance of the benefits. *Sociometrics*, 00-1 BCA ¶ 30,620 at 151,152-53. However, again in *Sociometrics* the Board considered the contracting

officer's knowledge, or actually the contracting officer's representative's knowledge, of a service being provided to be evidence of the implied-in-fact contract. But here, the Army paid the prime contractor for the provision of the Haymarket warehouse and there was no "knowing acceptance" of a benefit. In fact, rather than a "knowing acceptance" of the benefits, the contracting officer at the time that ESP entered its lease with FPRT, Ms. Abbruzzese, was aware of ESP's request for reimbursement of the early termination fee before ESP entered into the lease with FPRT, and she explicitly informed the prime contractor that the Army would not accept responsibility for the contingent liability (findings 13-15). A later contracting officer, Ms. Fernandes, rejected ESP's second attempt to insert liability for the early termination fee into the task order (finding 50). The understanding of the contracting officer for a finding of ratification is key and the knowledge of contract specialists or others involved with the contract is not relevant. *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005). Thus, we hold that ESP has not established the existence of an implied-in-fact contract with the Army. Moreover, as ESP has not established authority, we reject ESP's argument that the fact that the Army's rejection of the early termination fee does not preclude finding an implied-in-fact contract for the year six rent (app. reply br. at 8-9).

### III.    ESP has not Established Entitlement under *Quantum Meruit*

ESP asserts that it is entitled to recover under *quantum meruit* pursuant to the Board's holding in *Honeywell Int'l, Inc.*, ASBCA No. 57779, 15-1 BCA ¶ 36,121. In *Honeywell* the Board noted that where "the government receives the goods or services for which it contracted, but then seeks to avoid payment by arguing that the underlying contract was unlawful" the contractor may recover under the theory of *quantum meruit*. *Id.* at 176,340 (quoting *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1334 (Fed. Cir. 2006)). ESP additionally cites to *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) for the similar proposition that *quantum meruit* permits the contractor to be "compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid." As explained in more detail above, we hold that there was no contract between ESP and the Army, express or implied-in-fact, that would serve as the basis for recovery under *quantum meruit*. Recovery under *quantum meruit* prevents the government from unjustly benefiting from goods or services provided pursuant to an unenforceable contract. Here, we have held that there is no contract. Moreover, as noted above, the Army paid the prime contractor for provision of the Haymarket warehouse pursuant to the express contracts between the Army and prime contractors (findings 20, 49, 54). Thus, the government paid for the benefit it received, and there is no basis for recovery under a theory of *quantum meruit*.

Finally, we note that Count I of ESP's complaint asserted that the Army breached its prime contract with the Treasury Department's BPD (compl. ¶¶ 36-43).

ESP presented no evidence in support of this argument at the hearing, or in its post-hearing brief. This argument is waived.

## CONCLUSION

ESP has not established the existence of a contract with the Army for payment of the early termination fee, year six rent, and other costs. The appeal is denied.

Dated: 4 August 2017

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58633, Appeal of Engineering Solutions & Products, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

22